EXHIBIT

A

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

GEB SHIPPING COMPANY LIMITED of Cyprus

Claimants (Owners)

and

EMMSONS INTERNATIONAL LIMITED of New Delhi

Respondents (Time Charterers)

m/v "Evangelos L"

Time Charter dated 30th October 2002

### FINAL AWARD

WHEREAS

1. By a Time Charter dated 30th October 2002 on an amended NYPE 1946 form ("the Time Charter") it was agreed between GEB Shipping Company Limited of Cyprus as Owners ("the Owners") and Emmsons International Limited of New Delhi as Time Charterers ("the Charterers") that the Owners would let and the

Charterers would hire the vessel "Evangelos L" ("the vessel") for about one-time chartered trip with bulk wheat for duration about 25/30 days without guarantee always within Institute Warranty Limits.

2. By clause 4 the Charterers were to pay hire at the rate of US$6,500 per day, payable 15 days in advance, commencing on and from the date of the vessel's delivery on arrival first sea pilot station Kandla until the vessel's redelivery in like good order and condition, ordinary wear and tear excepted, on dropping last outward sea pilot Hodeidah. By clause 35 the only permitted cargo was wheat in bulk. Clause 47 of the Time Charter incorporated into the Time Charter the provisions of the NYPE Interclub Agreement ("the Interclub Agreement").

3. Clause 17 of the Time Charter provided that should any dispute arise between the parties, the matter in dispute should be referred to three persons in London, one to be appointed by each of the parties and the third by the two so chosen. The Arbitrators were to be commercial men, and also shipping men and members of the London Maritime Arbitrators Association.

4. Disputes having arisen, on 20th January 2003 the Owners appointed me, John Tsatsas, of 1A Netherhall Gardens, London NW3 5RN as Arbitrator and the Charterers on 20th February 2003 appointed me, Anthony O. Scott of Creek House, 39 The Lane, West Mersea, Essex CO5 8NS as Arbitrator. The two so appointed in turn on 5th July 2004 appointed me, David Farrington, of Gun House, 1 Artillery Passage, London E1 7LJ to act as Third Arbitrator. We are all Full Members of the London Maritime Arbitrators Association and members of The Baltic Exchange. We accepted our appointments on the basis of the LMAA Terms (2002) which, therefore, applied to the reference. The seat of this arbitration is England.

5. The disputes referred to us were claims by the Owners against the Charterers for the payment of the balance of a Final Hire Statement in the amount of

2

US$121,232.36 and an indemnity in respect of the cost of repairing damage to the vessel. Alternatively, the Owners claimed from the Charterers (a) damages for breach of contract arising from the shipment of dangerous goods in breach of Article IV Rule 6 of the Hague Rules, alternatively an indemnity in respect of losses caused by the Owners' compliance with the Time Charterers' orders, and (b) an indemnity under the Interclub Agreement in respect of the settlement of a cargo shortage claim, and (c) payment of an Additional War Risk Premium in the amount of US$32,500. The Charterers denied liability and put quantum in issue.

6. A hearing took place in London on 21st and 22nd October 2004. Both parties were represented by solicitors and counsel. Both parties at the hearing requested a Reasoned Award. Our Reasons are attached to this Award and form part of it.

NOW WE, DAVID FARRINGTON, JOHN TSATSAS and ANTHONY SCOTT having taken upon ourselves the burden of this reference, having carefully and conscientiously considered the evidence and submissions of the parties, and having found ourselves in agreement DO MAKE AND PUBLISH THIS OUR JOINT FINAL AWARD as follows:

(A) WE AWARD AND ADJUDGE that the Charterers must immediately pay to the Owners the sum of US$129,250.47 (One Hundred Twenty Nine Thousand Two Hundred Fifty United States Dollars and Forty Seven Four Cents) and €30,000 (Thirty Thousand Euros). The Charterers will pay interest on the said sum of $129,250.47 at 6.00 % per annum compounded every three months from 15th January 2003 until the date of payment. The Charterers will also pay interest on the said sum of €30,000 at the rate of 4.25% per annum compounded every three months from 27th March 2003 until the date of payment.

7

(B) WE RESERVE OUR AWARD, at the request of the parties, on liability for the Tribunal's costs of this Award which WE HEREBY FIX in the total sum of £21,335.00 including interlocutories. We also reserve, pending further submissions, our Award as to the costs of this reference.

GIVEN under our hands this 17 day of February 2005

_____  
David Farrington

_____  
S Redmayne  
Witness

_____  
John Tsatsas

_____  
Witness

_____  
Anthony Scott

_____  
Witness

m/v "Evangelos L"

Charterparty dated 30th October 2002

REASONS FOR AND FORMING PART OF THE FINAL AWARD

1. By a charterparty dated 30th October 2002 on an amended NYPE 1946 form it was agreed between Geb Shipping Company Limited of Cyprus ("the Owners") and Emmsons International Limited of New Delhi ("the Charterers") that the Owners would let and the Charterers would hire the Owner's vessel "Evangelos L" ("the vessel") for about one time chartered trip with bulk wheat for duration about 25/30 days without guarantee via safe ports, safe berths, safe anchorages, always afloat, always within Institute Warranty Limits. The vessel was to be placed at the disposal of the Charterers on arrival first sea pilot station Kandla, India, and was to be redelivered on dropping last outward sea pilot Hodeidah, Yemen. Hire was to be paid at the rate of $6,500 per day. By clause 35 of Charterparty the only cargo allowed was wheat in bulk.

2. The vessel arrived at Kandla anchorage at 23.59 (18.29 GMT) on 1st November 2002, and was delivered to the Charterers. On 2nd November between 12.30 and 16.30 there was a hold and hatch inspection, which included a hose test. The holds and hatches were found to be clean, dry and in an acceptable fit condition to load wheat in bulk. The pilot boarded at 15.25 on 3rd November and the vessel was all fast at berth no V at 17.30 on 3rd November. Loading commenced at 18.30 on 3rd November and was completed at 23.30 on 7th November. According to the final draft survey, the amount of cargo loaded was 29,317.144 tonnes of wheat in bulk. The distribution was as follows: 5,330 tonnes was in hold no 1, 7,375 tonnes in

1

hold no. 2, 6,000 in hold no. 4 and 5,740 tonnes in hold no. 5. Hold no. 3 was empty, and hold no. 4 was slack.

3. The Charterers arranged for the cargo to be fumigated by Pest Control (India) Pvt Ltd ("PCI"). They used "Celphos" aluminium phosphide tablets which were manufactured by Excel Crop Care Limited. The dosage was stated as being 12 grams per tonne. Fumigation took place on 7th and 8th November: hold no. 2 was fumigated between 20.00 and 21.30 on 7th November. In the instructions to the Master PCI stated that degassing was to be undertaken at least 168 hours after fumigation.

4. On 8th November the vessel shifted to the inner anchorage for bagged cargo to be placed on top of the cargo in no. 4 hold, which was slack. PCI left the vessel at 10.00 on 8th November. At 14.30 the same day the pilot boarded and the vessel departed. At about 14.55 on 8th November, whilst the vessel was underway in the channel and passing navigation buoy 7, there was a minor explosion in hold no. 2. The explosion shifted the six panels of the McGregor hatch cover and caused damage. The vessel anchored at the outer anchorage; during the subsequent few days temporary repairs were carried out and the cargo was refumigated with a milder dose of Celphos, ie 6 grams per tonne. The vessel finally sailed from Kandla at 02.30 on 14th November 2002.

5. The vessel proceeded direct from Kandla to Hodeidah for discharge. Discharge was completed at 15.10 on 13th December. However, the receivers of the cargo alleged that there was a shortage of 290.254 tonnes and asserted a claim for $40,229.20. The agents in Hodeidah, Atlas Shipping and Transport Co Limited, were instructed by the receivers not to arrange outward clearance for the vessel until the shortage claim had been settled. Following discussions between the Owners, their Club and the local representatives, the Owners effected a settlement which involved the Owners paying to the receivers the sum of $35,000. The vessel departed Hodeidah at 02.30 (00.30 GMT) hours on 15th December at which time she was redelivered to the Owners.

2

6.  The claim was initially advanced by Owners as one for the balance of a Final Hire Statement. However, it emerged at an early stage of the reference that, in fact, the Owners were making three claims against the Charterers as follows:

    (i)   Damages for breach of contract arising from the shipment of dangerous goods in breach of Article IV rule 6 of the Hague Rules or its United States equivalent, alternatively an indemnity in respect of losses directly caused by compliance with the Charterers orders. Hire was also claimed for the period for which the vessel was delayed by reason of the explosion.

    (ii)  An indemnity in respect of the settlement of the shortage claim with the receivers in Hodeidah, alternatively the Owners claim 50% of the settlement pursuant Interclub Agreement.

    (iii) Payment of an Additional War Risk Premium of $32,500.

    The Charterers denied liability. They said that for Owners to succeed in relation to claim (i) above Owners had to show that Charterers were liable for the explosion and the alleged losses that flowed from that explosion. Charterers alleged that they were not in breach of any duty of care which they owed to the Owners. There was no shipment of dangerous goods. Charterers advanced a positive case that the explosion was caused or materially contributed to by either water ingress into hold no 2 or the consequences of the Master's stowage plan or other aspect of the stowage. As to claim (ii) Charterers said that it was common ground between the parties that there was in fact no shortage of cargo at Hodeidah; the result, said the Charterers, was that there was no cargo claim in respect of which Owners were entitled either to an indemnity or to a contribution under the Interclub Agreement. The Charterers denied liability for the claim (iii) for the additional War Risk

Premium because Hodeidah was the agreed port of the delivery and that was factored into the rate of hire.

7. At the request of the Charterers there was a hearing on 21st and 22nd October 2004. Both parties were represented by solicitors and counsel, expert evidence was adduced. On 27th October the Charterers solicitors sought permission to address the Tribunal on 2 additional matters. The Claimants solicitors responded thereto and, therefore, those additional submissions have been included in the papers which have been considered by the Tribunal prior to making its decision.

8. The first matter to be decided is the cause of the explosion on 22nd November 2002. The Charterers put their case in the following way. They said that it was for the Owners to show on the evidence that Owners could discharge the burden of proof that the explosion was caused by the Charterers' breach of Charterparty; that is, the explosion occurred by reason of circumstances for which Charterers were responsible under the charterparty. The Charterers said that if Owners could not discharge that burden of proof, then Charterers were not liable. The Charterers said that the cargo was not dangerous. Alternatively, given that the vessel was hired for the purpose of carrying bulk wheat which is always fumigated, the rare risk of an explosion from the fumigant was precisely one of the risks that Owners contracted to bear, in the absence of a breach of charterparty or negligence by the Charterers.

9. During the course of the written submissions the emphasis of both parties' explanation for the explosion developed and altered. There is nothing unusual in that because, of course, as more evidence becomes available and experts become involved there is greater knowledge available on which to reach a conclusion. The case finally advanced by Charterers was that the explosion was caused or materially contributed to by:-

4

(a) Water ingress into hold number 2, due to failure to close the hatch covers during loading;

(b) Water ingress into hold number 2 when the hatch covers were shut;

(c) The Master's stowage plan or other aspect of the stowage.

The Owners' case was that the fumigant tablets used in hold no 2 on 7th November by PCI on and in the cargo were dangerous because they were capable of generating an explosive mixture. Owners' submission was that it was neither necessary nor appropriate for them to be too specific about the precise combination of parameters which on this occasion conspired to result in the explosion. It was sufficient for Owners' case that there was some combination of factors associated with the fumigant and/or the cargo which created a dangerous situation and resulted in explosion. Fumigation and provision of cargo were matters for which the Charterers were responsible.

10. It was common ground between the parties that the explosion was caused by the ignition of a small quantity of a flammable air/phosphine mixture and that the phosphine was generated by the fumigant tablets. It was also common ground that there was no potential source of ignition other than the reacting fumigant tablets themselves. Aluminium phosphide is regularly used to fumigate grain cargos on board a vessel, usually without incident. There were in evidence some details of another incident in India which involved fumigation; notice has been taken of that incident but the Tribunal on the evidence does not consider it to be an important factor in reaching the decision which it has in this reference.

11. After the explosion occurred, surveyors attended on board. Murray Fenton (India) were instructed by the Owners, UK Marine (India) Surveyors were instructed on behalf of the Charterers and/or the shippers, Rishi Shipping. It is clear from the reports of the surveyors that neither made any criticism of the cargo of bulk wheat itself. It is also clear that fumigation of bulk wheat is

5

a normal and accepted practice; fumigation in the ordinary course does not make bulk wheat a dangerous cargo. The Tribunal, therefore, finds that there was nothing inherently dangerous in the particular cargo. The question is, therefore, whether the explosion was caused by the fumigation, an outside source, or a combination of the two.

12. The possibility of water ingress into hold no. 2 was advanced in two ways. First, the suggestion was made by Captain Modi of UK Marine (India) that on the night of 6th November it had rained whilst the vessel was loading, and that the hatch cover had not been closed. There was support for this in the report of Murray Fenton which indicated light drizzle during that night and the possibility that the cargo was wetted, although there was some evidence that plastic sheets had been used to cover part of the hatch. There was no mention of rainfall in the deck log, and the Statement of Facts does not mention any stoppages for rain. In an official letter the Kandla Port Trust stated that there was no rain from 6th until 10th November.

13. On reviewing the evidence as a whole is not possible to make a finding that it did rain on the night of 6th November. Further, even if it is assumed that it did rain, it is not possible to make a finding that the rain caused the cargo to become so wet that a serious and adverse interaction with the fumigation tablets was inevitable. In fact, the evidence points in the other direction, because even if it did rain on the night of 6th November, on 7th November a further 1,000 tonnes or so of cargo was loaded into hold no. 2. That cargo would have been loaded on top of the allegedly wet cargo. The Tribunal considers that Captain Anderson, the expert instructed by the Owners, was right when he pointed out that if the rain was the primary cause of the problem in hold no. 2, then there should have been the same effect in holds nos. 1 and 5 which were also loading at the same time. It is also worth noting that had it rained to the extent submitted by the Charterers, damage would probably have been caused to the cargo and that damage would have manifested itself at Hodeidah. There was no evidence that such damage was

6

found. There was no evidence to support a suggestion by Charterers that washing of decks might have led the wetting of the cargo.

14. The second explanation advanced by the Charterers was that there was water ingress into hold no 2 after the hatch covers had been shut. The reports of the two surveyors who boarded the vessel after the explosion do not discuss that possibility. Mr Kocher, the Operations Manager of Rishi Shipping, who went on board the vessel on 8th November, also does not mention that possibility. The theory of water ingress in this manner was advanced for the first time in July 2004 by Captain Singh, the Charterers' expert, in the context of excessive moisture in hold no 2. admittedly, Captain Singh did not identify the source of that moisture. However, during his oral evidence at the hearing Captain Singh, quite correctly and very frankly, conceded that he was no better placed than anyone else to decide on whether the cargo had become wetted and, if so, the cause of that wetting. Capt Anderson's evidence was that condensation was unlikely until the vessel had moved to a colder climate. Dr Jonas, who wrote an expert's report on the instructions of Owners, advised that a period of 17.50 hours between completion of fumigation and the time of the explosion gave a timescale which was not consistent with wetting being the cause because with wetting a rapid reaction causes the explosion. Dr Jonas' evidence was not controverted by Dr Bland, whom the Charterers instructed. Having considered all the evidence the Tribunal is unable to find that there was any water ingress into hold no 2 when the hatch covers were closed. The surface of the cargo in that hold was not wet.

15. The principal debate between the parties (and, indeed, the experts) was whether the Master's stowage plan or another aspect of the stowage was the principle cause of the explosion, as the Charterers alleged, in that there was inadequate ullage space in hold no 2; that ullage inadequate space assisted in the lower explosion limit ("LEL") of phosphine gas being exceeded, so as to make it capable of combustion. The Owners said was that the dosage of tablets applied by PCI was higher than the maximum dose for equivalent

7

phosphide tablets recommended by other manufacturers which resulted in the LEL being exceeded. It was the Owner's case that the only possible source of ignition was the heat and gas produced by the reacting fumigant tablets themselves. It was common ground between the parties that the spontaneous ignition could only have been caused by wetting (see paras 12 – 14 above), piling or imperfections in the Cephos tablets.

16. Captain Singh wrote two reports which were dated 7th July and 23rd September 2004. A modest attack was made by Owners upon Captain Singh's qualifications to give expert evidence. However, the Tribunal was satisfied with Captain Singh's qualifications and experience. His evidence was, therefore, admitted.

17. Captain Singh's principal complaint was that the ullage space in hold no 2 was only 10 centimetres which, he said, could only have been due to bad and negligent cargo planning by the Master. Captain Singh postulated that that cargo planning could have been caused by reference to an incorrect or obsolete grain stability booklet. In his second report Captain Singh stated that if less than 100 tonnes had been transferred from hold no 2 to hold no 4, the ullage space in hold no 2 would have been doubled which might have prevented the explosion in the hold. Captain Singh was unable to find any reason why the Master decided to leave "no breathing space" in hold no 2 when he was aware that fumigation of the cargo would lead to formation of gas in the hold. Captain Singh concluded that the Master had not planned the stowage in line with prudent seamanship for a cargo of the type to be carried and which he, the Master, knew would require fumigation.

18. In his cross-examination Captain Singh stated that there could in fact have been better ullage spaces in all three holds. An ullage space of about one foot was common in India, because it led to better fumigation. However, he conceded that there was no regulation to that effect but he asserted that it was common knowledge amongst shippers, agents, and related people. He

8

considered that a void space larger than that in hold no 2 was important because it helped in the diffusion of the fumigant. He acknowledged, however, that the Pesticide Code said nothing about the risk of explosion or the need for a minimum ullage space, the written instructions produced by fumigators were similarly silent. He agreed with the calculations produced by Captain Anderson and therefore the conclusion that the void space above the cargo in no 2 hold was actually greater than that in holds nos 1 and 5. Captain Anderson and Captain Singh did disagree in relation to the obligation of the Master to minimise the ullage spaces by filling holds nos 1, 2 and 5 to the highest possible level in accordance with the IMO Grain Code. Although Captain Anderson conceded that the volume of the ullage space in hold no 2 was lower than that in holds nos 1 and 5, he was of the opinion that the difference was in fact minimal and he did not consider that in any real sense a space capacity of 16.3 tonnes (hold no 5) or 18.9 tonnes (hold no 1) was different from hold no 2 with a space capacity of 13.6 tonnes.

19. The key to the very helpful evidence given by the experts lies in Captain Singh's report dated 23rd September 2004. In the course of the discussion on the stowage plan he postulates whether a "safer ullage in number 2 hold" might have prevented the explosion. The use of the word "might" is interesting because it suggests that Captain Singh's thinking at the time was that a larger ullage space would not automatically have prevented the explosion. In that respect, he and Mr Anderson held common views. If due weight is then given to the fact that neither the IMO Grain Code nor the instructions from the two fumigation companies specifically mention the need for an ullage space of a certain volume or height, the conclusion on the evidence must be that the ullage space of itself was not the principal cause or did not materially contribute to the cause of the explosion. The ullage space was undoubtedly a factor in the way in which the explosion reacted. It follows, therefore, that the Charterers' criticism of the Master's stowage plan or other aspects of the stowage are not made out.