19

20    However, the Charterers say that for the Owners to succeed they must show a
breach of charterparty by the Charterers. The Owners' case is that the
fumigant tablets were loaded by PCI on and in the cargo; those tablets were
dangerous because, as it turned out, they generated an explosive mixture in
hold no 2 and caused it to be ignited. The Charterers are say the Owners
therefore liable pursuant to Article IV Rule 6 of The Hague Rules for the
direct and indirect consequences of the shipment of the fumigant tablets
and/or are liable to indemnify the Owners pursuant to the implied indemnity
associate with clause 8 of the Charterparty. It was Owners' case that it was
not necessary for them to be too specific about the precise combination of
parameters which on the particular occasions conspired to result in the
explosion. It was sufficient in Owner's view that there was some combination
of factors associated with the fumigant and/or the cargo which created a
dangerous situation and resulted in the explosion. The Owners suggested that
either piling of the tablets or a rogue batch of tablets with impurities were
possible causes.

21    The Charterers' position was that there was no recorded previous incident
involving PCI or Excel, and the fact that the dosage of fumigant used was in
the range recommended by manufacturers. The Charterers said that the cause
of the explosion was unclear. This was in large part due to the limited
investigation done at the time and the limited evidence before the Tribunal.
The Charterers invited the Tribunal to make a finding that the most likely
cause of the explosion was ignition caused by a hot spot created by a small
group of tablets coming into contact with water in hold no 2, in conjunction
with a restricted ullage space in the hold. The Charterers said that Owners
were responsible for such matters.

22    The factual evidence was limited. However, attached to the report of Murray
Fenton were photographs. The photographs were not of the highest quality
but they did show on the surface of the cargo fumigant tablets spread
unevenly across the surface and, in some areas, possibly piling. Murray

Fenton commented that the top layer of the cargo in hold no 2 was greyish in colour which, they said, was indicative of excessive fumigant having been used. In his report dated 8th October 2003 Mr Krishnan of PCI stated that of the fumigant used in hold no 2, between 40% and 50% were evenly distributed on the surface and the remainder lowered into the hold and evenly distributed throughout the stow. However, Mr Krishnan did not actually undertake the fumigation, nor did he attend the inspection on the vessel on 8th November after the explosion. Whilst there can be no doubt that Mr Krishnan accurately recorded in his report what he had been told by third parties, the evidence of Murray Fenton is to be preferred with the result that the Tribunal finds that the fumigant tablets were not evenly spread across the top of the cargo. It is also found that in some areas there were clusters of tablets, possibly in small piles.

23.  There was a high degree of unanimity between the experts on the nature and properties of the fumigant. Dr Bland was clear that wetting could only have caused the incident if the surface of the cargo in hold no 2 was wet. Dr Jonas on behalf of the Owners agreed. The Tribunal has already found in paragraph 14 above that the surface of the cargo in hold no 2 was not wet. It was agreed that the explosion was caused by the ignition of a small quantity of a flammable phosphine/air mixture and that the phosphine was generated by the fumigant tablets. There was agreement between Dr Bland and Dr Jonas that the ignition behaviour was complicated and unpredictable. It depended on several parameters, including the possible presence of impurities such as diphosphine. There was agreement between the experts that the LEL of a flammable phosphine/air mixture was 1.79% or 1.8% by volume. At concentrations lower than that, the mixture was too lean to support combustion.

24.  The real difference between the experts was on the dosage used. Dr Bland noted that a dosage rate of 12 grams per tonne was utilised and he commented that he had seen no evidence to indicate that this was excessive dose of

11

fumigant. Dr Jonas, on the other hand, said that although the dosage used might have been consistent with the instructions given by the manufacturer of the fumigant, it was in fact higher than the maximum dose for equivalent phosphide tablets recommended by other manufacturers. In Dr Jonas' opinion that dosage created a greater risk of the LEL being exceeded. Interestingly, both experts relied upon information from Degesh America Inc, an American manufacturer of aluminium phosphide tablets. It was Dr Bland's view that Degesh had not made any quantitative recommendations which sought to limit the surface concentration of pellets or void space volumes, whereas Dr Jonas' opinion was Degesh had made recommendations, as had the FAO in its Agricultural Services Bulletin number 109. However, it was recognised by Dr Bland that Thomas R Miller in Bulletin 289-2/03 had expressed concern at the fact that it was likely that potentially explosive mixtures would frequently be encountered in the upper reaches of holds although, as the bulletin conceded, it was not proven definitely.

25.   On the evidence it is not possible with any precision to make a finding as to the cause of the explosion. It has already been found earlier in these Reasons that the cargo was not wet on its surface. If the cargo had been wet, then it was not wet either at the point where it came into contact with the fumigant, alternatively, if it was wet, it was not so wet as to be the principal cause of the explosion. What is clear is that before the fumigant was either inserted into or placed on top of the cargo, there was no difficulty. What has also been found is that the fumigant tablets were not distributed evenly across the top of the stow, and that there were some areas where tablets were in clusters or possibly in small piles. Taking all these factors into account, the Tribunal finds that it was the fumigant and/or the way in which it was applied which caused the explosion. The Tribunal also finds that neither the cargo itself nor the stowage arrangements contributed to the cause of that explosion although, of course, the size of the ullage space in hold no 2 contributed to the effect of that explosion.

26.   The Owners advanced their claim for damages in two ways.  First, they said
that the Charterers were liable for breach of contract in shipping dangerous
goods; second, the Owners sought an indemnity and relied upon the principle
enunciated in the Island Archon [1994] 2 Lloyds Rep. 227.  Dangerous goods
in this context can by definition include an agreed specific cargo, the nature of
which is known to all parties, but which possesses some special and not
obvious characteristic which creates a danger outside the range of the dangers
which a carrier of that type of cargo should foresee and guard against.  In this
reference the agreed cargo was bulk wheat which, of itself, is innocuous.  It is
known that bulk wheat requires to be fumigated.  The cargo and the fumigant,
if properly loaded and applied, did not therefore possess some special and not
obvious characteristic which created a danger outside the range of the danger
which a carrier of bulk wheat should foresee and guard against.  However, an
explosion of fumigant is not a risk of the same kind as a carrier should
foresee.  Accordingly, a combination of the wheat and the method by which
the fumigant was applied was sufficient to constitute a dangerous cargo for
the purpose of Article IV Rule 6 of the Hague Rules.  The Charterers were in
breach of charterparty and, therefore, liable in damages.  The decision in
Acatos v Burns (1878) 3 Ex D 282 does not really assist Charterers because
Owners did not have the full opportunity of "observing" in the widest possible
sense of that word the dangerous nature of the combination of the cargo and
the application of the fumigant. In any event, the decision is inconsistent with
more recent authorities such as Bamfield v Goole [1910] 2 KB 94 and,
therefore, should be treated with a high degree of circumspection.

27.   In the alternative, the Tribunal considers that Owners are entitled to be
indemnified by the Charterers in accordance with the principles laid down in
the Island Archon.  The Charterers' order to load the cargo and for fumigation
to take place was lawful and one which they were entitled to give.  By giving
that order, loading the cargo and undertaking the fumigation, the Charterers
exposed Owners to a risk which, on the true construction of the charterparty,
the Owners did not agree to bear.  There was no evidence that the risk was

13

known to Owners. It was the Charterers who chose, through PCL, which fumigant to use and the method of application. Of course, the carriage of goods always carries a risk but the risk to which the Owners were exposed and which led to the explosion on 8th November 2002 at Kandla was a risk of a totally different kind from that which could reasonably be expected from the nature of the cargo and the terms of the charterparty. The explosion was not a result of "simple bad luck", as the Charterers put it. There was cargo and fumigant in the hold because the Charterers had ordered the vessel so to load and had accepted contractual responsibility for the physical conduct of the necessary operations: see the decision in the Athanasia Comninos & George C. Lemos [1990] 1 Lloyds Rep 277.

28.  The damages alternatively the indemnity claimed by the Owners was for the cost of the temporary and permanent repairs to the vessel plus a sum equivalent to the time taken whilst the repairs were effected. The vessel effected temporary repairs at Kandla and was detained, said the Owners, pending completion of those repairs, between 14.55 on 8th November to 020.30 on 14th November, a period of 5 days 11 hours 35 minutes. The cost of those repairs was claimed in the sum of $11,370, together with refumigation charges of $4,000. Permanent repairs were effected at Piraeus in February 2003 for which a period of 6 days 14 hours was claimed together with consumption of bunkers. The Owners claimed US$46,889.79 for the loss of the use of the vessel at the charterparty rate, and US$6,490 for bunkers. The Owners also sought the cost of the permanent repairs at Piraeus at €66,610. The Charterers said that the repairs carried out at Piraeus included items which went beyond those caused by the explosion and that in any event the repairs carried out at Kandla were 40% temporary and 60% permanent. All repairs should have been carried out at Kandla. The Charterers said that they had paid $9,700 for the cost of repairs at Kandla and Owners' expenses of $1,670, a total of $11,370. Further, there was no evidence of the alleged bunker consumption. The claim for the lost profits during the repairs at

14

24

Piraeus was, said the Charterers, wholly unsupported by evidence and the repair costs at Piraeus were excessive.

29. Neither party made a distinction between the amount of damages which could be claimed by the Owners as a result of the Charterers' breach of contract and the amount to which Owners were entitled as a result of the indemnity. Accordingly, in these Reasons the Tribunal makes no distinction. There was very limited evidence available to the Tribunal. Captain Anderson did not feel able to comment on the cost of the repairs at Kandla and in neither of his reports did Captain Singh deal with quantum. The Tribunal, therefore, finds that the cost of the temporary repairs at Kandla was reasonable. However, it is clear from the evidence that Charterers have paid for the cost of those repairs and, therefore, there is no amount due to Owners in that regard. Owners are, however, awarded an amount of hire (or its equivalent in damages) for the time lost whilst repairs etc. were undertaken: the period is 5 days 11 hours 35 minutes. The Tribunal accepts, contrary to the Charterers' submission, that not all the repairs could have been effected permanently at Kandla. Although the Owners claimed refumigation charges of $4,000, there was no evidence either that such refumigation had been carried out or, if it had, evidence of payment by the Owners.

30. The position at Piraeus, however, deserved a degree of scrutiny. At Piraeus the side plating, both port and starboard were found to be heavily buckled by the workshop. However, no such damage was reported at Kandla by the Classification Society surveyor during the original survey or at any of those which followed. Further, during the class survey in India it was stated that 36 out of the 44 hatch cover cleats were damaged; those 36 were replaced. The Greek workshop included in its invoice the cost of replacing a further 8 cleats. Against that background it is difficult to see that the cost of replacing those 8 cleats was a consequence of the incident at Kandla. Although it is not easy to quantify precisely, renewals of certain small steel plates and brackets appear to be a repetition of work done in India. The use of the floating crane was the

15

subject of oral evidence by Captain Singh; he said that given that the vessel
was fitted with cranes and the fact that the plates, equipment and parts
involved could have been transported on board by launch, the hire of the
floating crane was unnecessary. The Tribunal agrees with Captain Singh.
Using its experience in these matters, the Tribunal concludes that the cost of
the repairs in Greece should not have exceeded €30,000; that sum is awarded.
The Tribunal also considers that the permanent repairs should have taken no
more than five days to complete in Greece. At the charterparty rate of $6,500
per day, the amount awarded for loss of time is $32,500 less commission at
3.75%, a net sum of $31,281.25. The Owners are also awarded 12.5 tonnes of
mdo used whilst the vessel was under repair at Piraeus; at the charterparty rate
of $255 per tonne, the amount awarded is $3,187.50. The total amount
awarded at Piraeus is, therefore, €30,000 for repairs and $34,468.75 for time
and bunkers.

31. The circumstances in which the cargo claim was made in Hodeidah are set out
in paragraph 5 of these Reasons. Although the Owners were placed in a very
difficult position because they were, in effect, confronted with what both
parties recognised to have been a sham claim, it is unfortunate that Owners
did not give the Charterers any opportunity whatever to comment upon or
otherwise become involved whilst the cargo claim was pending in Hodeidah.
By Clause 47 of the charterparty it was agreed that liability for cargo claims,
as between Owners and Charterers, should be apportioned as specified by the
Interclub Agreement effective 1976, and any amendments thereto.
Charterers' principal submission was that no cargo claim as such was made;
what happened at Hodeidah was extortion dressed up as a cargo claim. The
Charterers said that the purpose of the Interclub Agreement was not to reward
Owners for making arrangements, no matter how sensible, with dishonest
cargo interests. The Owners' position was that however the facts at Hodeidah
were presented, a claim was made and Owners had to deal with it. The fact
that a shipowner had no belief in the strength of the relevant claim was
irrelevant. A claim for shortage had been made and it fell within Recital (3)

16



of the Interclub Agreement and (4)(a)(i) and (c) of the Interclub Agreement. So far as the Owners were concerned, the claim had arisen and had been properly settled, compromised and paid.

32. There is no doubt that a claim was made. Although the vessel was not formally arrested at Hodeidah, it is well known that a detention requested by a Yemeni party has the same practical effect. That the vessel was not formally arrested is a technicality. It was clear on the (agreed) evidence that she could not sail and would have been unable to sail at the relevant time had efforts been made. The evidence was that the vessel would not be permitted to sail until the receivers received satisfaction. A claim can be made in various ways; not every jurisdiction in the world follows formal western procedure. The motives of the claimant are irrelevant. The principal issue is whether a claim has been made in circumstances and in terms which fall within the wording of the Interclub Agreement. The Tribunal agrees with the Owners' construction of the Interclub Agreement. The Owners are, therefore, awarded $17,500 under (8)(c) of the Interclub Agreement; i.e. 50% of the amount paid to the party making the claim in Hodeidah. For the period in Hodeidah when the vessel was unable to sail because of the cargo claim, the Tribunal finds that the vessel was off-hire for 1 day 6 hours 30 minutes within Clause 36 and/or Clause 70 of the Charterparty. There was a shortage and the vessel was detained as a result of that shortage, even if there was no formal arrest.

33. The final issue between the parties was a claim by the Owners for payment of an Additional War Risk Premium in the amount of $32,500. The Owners submitted that by virtue of Clause 44 of the charterparty, any Additional War Risk Premium charged by reason of the area traded under the charterparty was for the Charterers' account. The Charterers, on the other hand, said that the vessel was always destined for Hodeidah and the rate of hire, therefore, included that sum which Owners knew they would have to pay by way of extra War Risk Premium. The Charterers referred to Clause 63 of the Charterparty which they said was directed at a case where a vessel is taken on

time charter and charterers elect to take that vessel to a port where an extra War Risk Premium is due.

34. The charterparty, somewhat unhelpfully, has two clauses dealing with War Risk insurance. Clause 44 makes it clear that the Basic Annual War Risk insurance was to be for Owners' account the clause then proceeds to say "any additional premium by reason of areas traded under this Charterparty and crew war bonus, if any, are to be for charterers account." Clause 63 provides that the Annual War Risk insurance premium was to be for Owners account, but any Extra War Risk insurance premium required by the vessel's underwriters and crew war bonuses resulting from the trading of the vessel during the currency of the charter were to be for charterers account. Although the words of the two clauses were not identical, nevertheless as a matter of construction the meaning is clear. Although the Tribunal has some sympathy with the Charterers' submission that a call at Hodeidah would have been factored into the daily rate of hire, either or both of Clauses 44 and 63 provide that if an additional premium is required by reason of the area traded under the charterparty, that additional premium was to be paid by the Charterers. Underwriters did require an additional premium because the vessel went to Hodeidah, which was a port specifically named in the charterparty. There was evidence that $32,500 had been paid as the additional premium. Accordingly, on the construction of the two clauses the Tribunal considers that Owners are entitled to be paid the cost of the additional War Risk insurance, namely $32,500.

35. The total amount awarded for the heads of claim considered in these Reasons is, therefore, $118,769.51 and €30,000. Charterers are entitled to a credit of $8,260.42 for the off-hire at Hodeidah. If all these figures are factored into the Final Hire Statement, then the balance due to Owners is, therefore, $129,250.47 as shown on the following page. Owners are also due to be paid €30,000 for the cost of repairs at Piraeus. Interest on each of those amounts is awarded at rates and in a manner which is in accordance with the practice in

18

London Maritime Arbitration. At the request of both parties, the Tribunal has reserved its decision on the costs of the Award, including the Tribunal's own costs. However, given the decisions which the Tribunal has reached, it is hoped that the parties will be able to agree on costs without further ado.

19



"Evangelos C"

Charterparty dated 30th October 2002

Final Hire Statement

| Item | Description | $ Debit | $ Credit |
|------|-------------|---------|----------|
| 1 | Hire from 18:29 GMT on 01.11.02 to 00:30 GMT on 15.12.02 (less off-hire at Hodeidah of 1 day 6 hours 30 minutes) | 272,369.10 | |
| 2 | Commission at 3.75% | | 10,232.59 |
| 3 | C/V/E | 1,441.69 | |
| 4 | Bunkers consumed during trip | 56,776.79 | |
| 5 | ILOHC | 4,000.00 | |
| 6 | Owners Expenses | | 1,670.00 |
| 7 | Additional War Risk premium | 32,000.00 | |
| 8 | Contribution under Interclub Agreement | 17,500.00 | |
| 9 | Piraeus repair time (less commission) | 31,281.25 | |
| 10 | Bunkers consumed during repairs | 3,187.50 | |
| 11 | Payments received | | 282,403.27 |
| M | Sub-Totals | 423,556.33 | 294,305.86 |
| 12 | Balance due to Owners | | 129,250.47 |
| 13 | Totals | 418,987.14 | 418,987.14 |

20

THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

GEO SHIPPING COMPANY LIMITED of Cyprus

Claimants (Owners)

and

EMMSONS INTERNATIONAL LIMITED of New Delhi

Respondents (Charterers)

m/v "Evangelos L"

Time Charter dated 30th October 2002

## FINAL AWARD ON COSTS

1. By a Joint and Agreed Final Award dated 17th February 2005 ("the Award") we, David Farrington, John Tsatsas and Anthony Scott, as Arbitrators, awarded and adjudged that the Claimants' claims succeeded in the amount of US$129,250.47 and £30,000.00. At the request of both parties we reserved to ourselves the decision on liability for (i) the costs of the reference and (ii) the costs of the Award which we had fixed at £21,585.00.

2. By section 63 of the Arbitration Act 1996 we have power to determine by award the amount and basis of such recoverable costs. The seat of this arbitration is London.

3. On 9th September 2005 the Claimants made an Application for an award that they be paid 100% of their costs incurred in the reference which they placed at £56,834.72 and €39,600. The costs were itemised in appendices which were attached to the Application. The Claimants also sought their costs of the assessment procedure and interest on any costs which might be awarded. At our request the Claimants on 19th September provided further information with reference to the lawyers and other advisers who had represented the Claimants in connection with the Award.

4. We made the following Orders:

   (1) On 3rd October 2005 that the Respondents by 31st October 2005 make submissions in writing on the Claimants' Application.

(2) On 5th November 2003 a Final and Peremptory Order that by 13th November 2003, the Respondents make submissions in writing on the Claimants' Application. We gave notice that in default of such submissions we would exercise our powers under section 41(7) of the Arbitration Act 1996 and proceed to an award on the basis of such materials as were properly before us.

We are satisfied that the Respondents (and their London solicitors, until they took themselves off the record as representing the Respondents) received the messages sent to them by both the Claimants' solicitors and ourselves. The Orders made by us were transmitted by fax, and on each occasion the transmission was successful. On 29th November 2003 we informed the parties that as the Respondents had not made any submissions in writing, we were proceeding in accordance with section 41(7) of the Arbitration Act 1996.

5. It is clear from the Award that the Claimants were successful in terms of establishing liability for the claim. They did not succeed, however, in recovering the full amount claimed. The grounds of the Respondents' denial of liability were considered and rejected, in accordance with the general principle of English law, which is restated in section 61(2) of the Arbitration Act 1996, we award the Claimants their costs of the reference. However, we consider that those costs should be awarded on the standard basis (and not the indemnity basis). Although the Claimants were successful in effecting a substantial recovery, some of the points made by the Respondents were worthy of serious consideration. This was not a matter where the Respondents had no defence at all. Further, although we recognise that the oral hearing was requested by the Respondents (and that hearing, of course, resulted in delay and more expense) we are unable to conclude that the hearing should never have been held.

6. We have the following comments on the appendices to the Application, and the additional information provided by the Claimants on 29th September. Our commissentary made in the context of a standard basis recovery from the Respondents and do not, of course, affect the position between the Claimants and those whom they appointed.

   (a) The basis of the retainer of Leeward Consultancy by the Claimants is understood and accepted. Consultants are entitled to recover their fees in defined circumstances which include representing a party in an arbitration reference. However, we consider that the fees are high for the amount and type of work undertaken. The fees are, therefore, allowed in the amount of £35,000.00.

   (b) Marine Law are solicitors and, as their name suggests, are specialists in maritime work. They took over conduct of the reference from Leeward Consultancy. Within Marine Law the reference was conducted by lawyers of an appropriate seniority. However, they instructed Michael Coburn of counsel who is very experienced in maritime arbitration. We consider that the instruction of and reliance upon counsel is a factor to be taken into account when assessing fees. A reliance on counsel must be properly reflected in solicitors' charges. We consider in the circumstances, that the appropriate fee for Marine Law should be £10,000.00. We allow Mr Coburn's fee of £12,000.00 in full. We also allow in full the disbursements of £463.77.

(c) The experts' fees of Brookes Bell caused us some problem because there appeared from the evidence at the hearing to be a measure of agreement between Mr Bland and Dr Jonas on one aspect and also between Capt Singh and Ms Anderson on another aspect. On reviewing the contribution which the expert testimony made to our decision, we consider that the appropriate amount of Brookes Bell's fee is £12,000.00.

(d) The Tribunal's fees are allowed in the amount of £18,551.00 together with the Booking Fees of £850.00 (which should have been paid by the Respondents as they requested the hearing) and Appointment fees of £250.00.

We, therefore, award to the Claimants £35,000.00 and £34,463.72 as their recoverable costs of the reference on the standard basis. We also award to the Claimants the Tribunal's fees, including Booking Fees and Appointment Fees of Messrs Farrington and Tsatsas of £19,951.00 (the difference between that amount and the fees in the Award represents Booking fees properly paid by the Respondents). The £ sterling amount awarded is, therefore, £54,414.72.

5. In accordance with the usual practice in London maritime arbitration we award to the Claimants interest on the amounts identified in paragraph 6 above. We consider that the best approach is to award interest from the date of the Award, ie 17th February 2005. Interest on £35,000.00 will accrue at the annual rate of 4% compounded every three months. Interest on £54,414.74 will accrue at the annual 6.75% and will also be compounded every three months. In each case interest will accrue until payment.

6. The Claimants have been successful in their Application. The Respondents will pay the Claimants' costs of this Costs Award which we assess at £1,200.00 together with our fees of this Costs Award.

NOW, WE, DAVID FARRINGTON, JOHN TSATSAS and ANTHONY SCOTT, having carefully and conscientiously considered the evidence and arguments submitted to us, DO MAKE AND PUBLISH this our JOINT AND AGREED FINAL AWARD ON COSTS.

(A) WE HOLD AND DECLARE that the Respondents will pay the Claimants' recoverable costs of the Award, such costs to be assessed by us on the standard basis.

(B) WE ASSESS the Claimants' recoverable costs and disbursements of the Award in the amount of £35,000.00 and £54,414.72 and no more. WE AWARD AND ADJUDGE that the Respondents shall immediately pay to the Claimants the said sums of £35,000.00 and £54,414.72 together with interest thereon from 17th February 2005 until the date of payment. Interest on £35,000.00 shall be at the annual rate of 4% and on £54,414.72 at the rate of 6.75%. In each case interest shall be compounded every three months until payment.

(C)  WE FURTHER ASSESS the Claimants' recoverable costs of this Costs Award in the sum of £1,200.00 and no more: WE FURTHER AWARD AND ADJUDGE that the Respondents shall immediately pay to the Claimants the said sum of £1,200.00 together with interest thereon at 6.75% from the date of this Costs Award until the date of payment, such interest to be compounded every three months.

(D)  WE FURTHER AWARD AND ADJUDGE that the Respondents do pay the Tribunal's fees of this Costs Award which WE HEREBY FIX at £2,360.00, provided always that if the Claimants have in the first instance paid any sum in respect of the said costs they shall be entitled to immediate reimbursement by the Respondents of the sums so paid together with interest on those sums at 6.75% (such interest to be compounded every three months from the date of payment by the Claimants until the date of reimbursement by the Respondents).

GIVEN under our hands this 17 day of January 2006.

David Farrington.                          Witness

John Fearns

Anthony Scott                              Witness

                                           Witness