CHALOS, O'CONNOR & DUFFY LLP
Attorneys for Plaintiff,
GEB SHIPPING CO. LTD
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GEB SHIPPING CO. LTD.,          :
                                :
                     Plaintiff, :
         v.                     :       06 CV 7649(RCC)
                                :
EMMSONS INTERNATIONAL LTD.,     :
                                :
                    Defendant.  :
-----------------------------------------------------------x

## DECLARATION IN SUPPORT OF OPPOSITON
## TO VACATE PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT

The undersigned, Prashant S. Pratap, an Indian national, with law offices at 151, Maker Chambers III, Nariman Point, Mumbai, 400 021, India, presents this declaration to set forth points of Indian law in support of the Plaintiff's Opposition to the Defendants' Motion to Vacate the Process of Maritime Attachment and Garnishment that was issued by the Clerk of the Court for the above captioned matter on September 22, 2006.

I hereby declare as follows:

1.    I am a graduate of the Government Law College, Mumbai, India, from which I received my law degree in 1983. I have also received a Master's degree in Law (LL.M.) from University College London, UK, in 1985.

2

2. I am registered with the Bar Council of the State and am entitled to practice law and appear in all Courts in India including the Supreme Court of India. I have been involved as an expert witness on Indian law in proceedings in the UK, Canada, South Africa and Singapore.

3. I regularly practice commercial law, and I am fully familiar with trade practices in India and the Negotiable Instruments Act.

4. I have read and considered the Motion to Vacate the Process of Maritime Attachment presented by the Defendant Emmsons International Limited (hereinafter "Emmsons") in the above-captioned action with particular attention to the exhibits, the Memorandum of Law and the written opinion of Avadh Behari Rohatgi dated February 8, 2007.

5. I understand the question at issue to be whether, under Indian law, the Defendant Emmsons has or had any tangible or intangible interest in the funds that were being remitted to the Oriental Bank of Commerce and which were attached at the Standard Chartered Bank in New York.

6. I am qualified to present an opinion on that issue and, in my considered opinion, the Defendant Emmsons did and does have a tangible and intangible interest in those funds.

7. The contract for the sale of the rice cargo provides for payment to be made by Akila Trading (PTY) Ltd. (hereinafter "Akila") to Emmsons in respect of the quantity purchased and the price set out "Basis DA 90 days from Shipped on board B/L". *See*, Affidavit of Anil K. Monga in Support of Defendant's Motion to Dismiss the Verified Complaint (hereinafter "Monga Affidavit") at Exhibit F, page 11, a copy of which was provided to me by the Plaintiff. It is pursuant to this obligation that payment was made by Akila. Thus Akila's payment is to Emmsons. How Emmsons structures the manner of receipt of this payment cannot detract from the fact that the payment is to Emmsons or to their account. The payment arrangements under the contract between Akila and Emmsons is not a letter of credit transaction where the payment obligation is that of the letter of credit opening bank upon presentation of documents and which is irrevocable.

2

3

8.  Based on the documentation provided by Emmsons, it appears that Emmsons
    enjoys a Foreign Bill Purchase Facility with the Oriental Bank of Commerce
    (hereinafter "Oriental Bank"). *See*, Monga Affidavit, Exhibit E. This is a
    "facility" meaning a credit facility granted by Oriental Bank to Emmsons as
    stated in the letter dated August 8, 2006 issued by Oriental Bank to Emmsons.
    See, Monga Affidavit, Exhibit E. The August 8, 2006 letter refers to "Sanction
    of/Renewal–cum-Enhancement of Credit Facilities of your Company". The
    "Detailed terms and conditions of the sanction" shows that the security for the
    facility is the Foreign Documentary Bill presented for credit. Thus the facility
    is granted against security of a Bill. This means that the Bill of Exchange dated
    August 21, 2006 was drawn by Emmsons requiring payment to be made to
    Oriental Bank by the drawee, Akila. This Bill operates as security for the credit
    facility that the bank granted to Emmsons. In other words, the payment made
    by Oriental Bank to Emmsons is against security of this Bill. Thus Emmsons
    have a real and tangible interest in the funds remitted by the drawee Akila.

9.  The "Foreign Bills Purchase Advice" produced by Emmsons and provided to
    me by Plaintiff, also sheds light on how credit under this credit facility is
    provided and used. I stated above that the Bill was taken by Oriental Bank as
    security. The Foreign Bills Purchase Advice shows that the Bill is then
    purchased. The purchase is against the "credit facility" enjoyed by Emmsons
    with the bank. Hence this amount is shown as a debit ("Dr") in the account of
    Emmsons in respect of this purchase. Then this is immediately shown as an
    operative credit so that Emmsons can utilise the amount. One of the conditions
    of this "facility" is that Emmsons must use the credit to offset the packing
    credit availed by them. *See*, Monga Affidavit, Exhibit E, Annexure 'B' "Terms
    and Conditions for Foreign Documentary Bill Purchased (FDBP) Foreign
    Usance Documentary Bill Purchased (FDDBP) Facility," clause 6. Hence the
    packing credit is debited against this credit. Also see clause 7 which refers to
    "Advance" which is what it really is. *Id.*

10. When the payment is received by Oriental Bank from Akila, the amount would
    be credited by Oriental Bank to the account of Emmsons against the Purchase
    debit entry which would then stand reversed. If the amount is not received the
    debit entry would remain and the Bank would be able to independently recover

4

the amount of the debit from Emmsons. Pertinently, Emmsons have not produced the statement of their operative account which would show what entries have been made in that account by Oriental Bank from the date of purchase until now. Additionally, Oriental Bank has not appeared in the New York lawsuit to claim an interest in the funds nor has Oriental Bank filed a motion to vacate the attachment, which they would have done if they were affected, or if they had no other recourse to recoup payment of over US$365,000.

11.  The argument that Oriental Bank is a holder in due course or that the Bill of Exchange has been negotiated in favour of the bank, is not correct. Oriental Bank is the holder of the Bill of Exchange. The reason the Bank is made the holder of the Bill of Exchange is because then Emmsons enjoys credit facilities with the bank while the Bill of Exchange operates as security for the money that Oriental Bank will advanced to Emmsons. This liability of Emmsons to pay Oriental bank is discharged upon Akila making payment of the Bill of Exchange to Oriental bank. As such the Bill of Exchange is not divorced from the underlying transaction. They are part of the same transaction and cannot be divorced from one another.

12.  Hence it would be completely misleading to look at just the Bill of Exchange in isolation, as argued by Emmsons in its Memorandum of Law. The opinion of Mr. Rohatgi proceeds on the wrong assumption. The transaction is, in reality, different from what it is stated to be in his opinion.

13.  The Indian judgment referred to by Mr. Rohatgi (Dena Bank v. The Madhya Pradesh National Textiles Corporation Ltd.) turned on the facts, not the law. A copy of the judgment is attached herewith as Exhibit A. In that case the Manager of a Bank gave evidence that the value of a Bill was credited to the account of a customer and if the customer so desired, he could withdraw the amount. This was an unconditional credit and not a debit entry as in the case at hand where the debtor was given the "facility" to use the amount credited. In other words, the Dena Bank case was a clear purchase by the bank in the usual course of business and not against any "credit facility" as in the present case. In such a case it was held that the bank itself became the purchaser and the holder thereof for full value and could not reverse the credit unless the Bill was

5

dishonoured. Precisely to overcome this legal position that left the bank without recourse against the customer, the banks have been showing the purchase as a debit in the account of the customer, as was done by Oriental Bank in the case of Emmsons, in order to protect themselves. Unless this debit is reversed by a credit when the amount is credited upon receipt from Akila, Emmsons liability to the Bank remains. Thus, Emmsons have a real tangible interest in the funds.

14. In paragraph 16 of the judgment of Dena Bank, a reference is made to Halsbury's Laws where "it has been stated that whether the Bill is taken from a customer for collection or as security or discounted for him is a question of fact." (Emphasis supplied). In our case the Bill was taken by the bank as security.

15. It should be further noted that execution proceedings have been filed by the Owners against Emmsons in the Delhi High Court. I have been informed by Mr. O. P. Gaggar, the Advocate on record for GEB Shipping Limited in the Delhi High Court proceedings, as follows. The matter was listed in Court on 3rd October 2006 when Counsel appeared for Emmsons and the Court granted Emmsons four weeks to file their reply and two weeks thereafter for owners to file their rejoinder. The hearing was fixed on 10th January 2007. No reply was filed by Emmsons and at the hearing on 10th January 2007, Counsel for Emmsons Mr. Sanjeev Puri submitted in Court that the owners, GEB Shipping Limited, have attached US$ 400,000 of Emmsons in New York and hence owners are adequately secured and their application in the Delhi High Court should be dismissed. The judge observed that it was up to the Respondent to bring these facts on the record in their reply and adjourned the hearing to 30th March 2007. A copy of the letter dated February 15, 2007 from Mr. O. P. Gaggar is annexed hereto as Exhibit B. No order of attachment has been made by the Delhi High Court in the light of these submissions by counsel for Emmsons.

16. Emmsons have now served a reply sworn by their Managing Director Anil Kumar Monga where Emmsons object to the execution proceedings in the Delhi High Court on the ground that GEB Shipping have sought enforcement

6

of the Award before the District Court, New York and an amount of USD 365,427.17 being the Award amount, has been attached in New York (See paragraph 2 of the Objections filed by Emmsons in the Delhi High Court). According to Emmsons, this was a payment payable by a buyer of the Respondent (Emmsons) and the attachment is an attempt to seize assets of Emmsons (Judgment Debtor) in different jurisdictions and this is causing them prejudice. This clearly and unequivocally demonstrates that not only do Emmsons have a real tangible interest in the funds but that the funds belong to Emmsons.

I do so declare under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America that the foregoing is true and correct.

Dated: May **3**, 2007 at Mumbai, India

Signed: _____

Prashant S. Pratap, Advocate

**EXHIBIT A**

witnesses for the respondents, the negligence on the part of respondent No. 2 is quite obvious. While crossing respondent No. 2 was expected to have taken a reasonable care that the vehicle or any part thereof does not dash against Sudamabai who was sitting on the Puliya. In such a case the speed of the vehicle being slow is an irrelevant factor. It is equally irrelevant in such a case whether the crush injury was as a result of the front wheel or the rear wheel. Thus, even on the evidence of respondents themselves, rash and negligent driving of respondent No. 2 at the time of accident is amply made out.

9. As stated earlier, Sudamabai remained in the hospital till 15th May, 1978. She was under treatment in the hospital. She had multiple compound fracture and due to complications, had developed tetanus and jaundice. She had developed Gangrene also. No doubt, Dr. Jain gave a contrary version in para No. 8 of his evidence that Sudamabai had not developed Gangrene. He also opined that the cause of her death could not be the injuries. It was contended on behalf of the respondents that as the cause of death was not the injuries, the appellants are not entitled to claim any compensation owing to Sudamabai's death. A similar question was considered in Govind Singh v. A. S. Kailasam (1975 Acc CJ 215) : (AIR 1975 Mad 65). After referring to the various decisions, it was held as follows (at p. 69 of AIR) :—

"Having regard to the fact that the setting in of tetanus is a foreseeable and likely consequence of any bleeding injury and in the absence of evidence to show that any other supervening cause brought about the tetanus infection there is absolutely no possibility of Heera Bai's death being caused by novus actus interveniens. The Tribunal's reasoning and conclusion on this aspect of the matter is clearly erroneous and I have no hesitation in holding that Heerabai's death was due to causes directly connected with the injury sustained in the accident."

We do not find that the cause of death of Sudamabai was remote, or unconnected with the injuries sustained by her. In our opinion, these complications are quite foreseeable and are not of uncommon developments. Dr. Jain (P. W. 3) has stated that she was removed from the hospital on 15-5-78 just at the time when she was more or less dying. That being so, the respondents could not escape the liability only on the ground that the injuries by themselves which she had received was the immediate cause of her death.

9-A. The Tribunal has adversely commented upon the discrepancies in the name of the injured in the different pages of the Bed Head ticket. Dr. Jain (P. W. 3) has been asked about the discrepancies but nobody questioned him about the reason thereof. The evidence of Dr. Jain cannot however, be rejected merely because of the said discrepancies. His opinion about the injuries to Sudamabai and the subsequent complications in the hospital which obviously were due to the injuries remained unchallenged.

10. On behalf of the respondent a faint attempt was also made to urge that the amount of compensation determined by the Tribunal deserves to be reduced. The Tribunal while determining the amount has taken into account so many relevant factors. Even if some of the factors were to be ignored the amount does not deserve to be reduced on the ground that the value of money has in the meantime comparatively gone down. An attempt was also made on behalf of the appellant to say that the amount of compensation deserves to be enhanced, on going through the evidence and the circumstances, in our opinion, the amount as he has been determined by the Tribunal does not call for any interference.

11. As a result of our findings, the impugned award of the Tribunal cannot be upheld and deserves to be set aside. The appellants would be entitled to Rs. 7,040/- as compensation.

12. Consequently, this appeal is allowed. The impugned award is set aside. The appellants shall be entitled to an amount of Rs. 7,040/- from the respondents. The appellants shall also be entitled to interest @ Rs. 6 per cent per annum from the date of the award by the Tribunal i.e. from 9-5-79. In view of the divided success, there shall be no order as to the costs of this appeal which shall be borne by the parties as incurred.

Appeal allowed.

**AIR 1982 MADHYA PRADESH 85**

G. P. SINGH, J. AND FAIZANUDDIN, J.

Dena Bank, Appellant v. The Madhya Pradesh National Textiles Corporation Ltd. Respondent.

First Appeal No. 172 of 1979, D/- 16-12-1981.

Negotiable Instruments Act (26 of 1881), S. 50 — Effect of endorsement —

From decree of H. N. Hazari, Addl. Dist. J., Burhanpur, D/- 8-5-1979.

AZ/BZ/A275/82/SNV

86 M. P.                    Dena Bank v. M. P. N. T. Corpn. Ltd.                    A. I. R.

On receipt of documents of bills from customer, bank crediting value thereof to customer's account and permitting customer to withdraw therefrom — Bank is the holder of documents, i.e., bills for full value — It cannot reverse credit entry without returning documents to customer if drawee dishonours them. (Banker and Customer).

If the bills and the relevant documents presented by its drawer are accepted by a banker with endorsement in its favour and the same are immediately discounted by the banker without waiting for its collection by the drawee, by giving full credit for the entire amount of the document, so presented, the banker itself becomes a purchaser and the holder thereof for full value.

(Para 16).

Where the Manager of a bank deposed that after receiving the bills from the customer duly endorsed in favour of the Bank, the value thereof was credited to the account of the customer and if the customer so desired he might withdraw the said amount from his account and also deposed that the amount so credited was the value of the goods covered by the bills and that after the transport receipts are presented to the Bank duly indorsed in its favour, the Bank further indorses the same in favour of the collecting agent and that party alone will get the goods in whose favour the bank endorses the same, it was amply clear that the bank was not only a collecting agent of the documents presented to it by the customer but the documents on presentation were discounted by the Bank and the value was credited to the account of the customer immediately without waiting for its collection from the drawee, and the Bank was purchaser of title documents and it was a holder thereof for full value. Consequently, in such a case, it was the responsibility of the Bank itself to collect the amount of the bills from the drawee to reimburse itself and if the drawee refused or the documents were dishonoured or the drawee could not be found, to present the documents back to the drawer and collect the value thereof either in cash or by reversing the credit entry by debiting the same amount in the drawer's account but not otherwise.

(Para 17)

Cases Referred : Chronological Paras
1966 MP-LJ-728—(1966)-61-ITR-555—16.
AIR 1965 SC 1954                            12

P. K. Munshi, for Appellant: G. M. Chaphekar with A. K. Khaskalam, for Respondent.

**FAIZANUDDIN, J. :** — This is a defendant's appeal, directed against the judgment and decree dated 8th May 1979, passed by the Additional District Judge, Burhanpur, in Civil Suit No. 1-B of 1972, whereby the plaintiff's suit has been decreed.

2. The undisputed facts between the parties are that Tapti Mill, Burhanpur, was a limited company, having its registered office at Burhanpur, which was declared a Relief Undertaking Mill, under Industrial Development Regulation Act, 1951, and its management vested in the Central Government and was being managed by the Authorised Controller. The defendant Bank is one of the Scheduled Banks which carries on banking business, having its registered office at Harriman Circle, Fort, Bombay, and a branch at Lal Bagh, Burhanpur, besides other places. It has also not been disputed that the plaintiff company, transacted business for sale of 43 bales of cloth, manufactured by plaintiff mill to one Bombay Textiles Agency, Sewapur, Purnia, Bihar. The consignment of 43 bales of cloth was booked on various dates in Jan. and Feb. 1972 as detailed in plaint para 4, by road, through the carriers, Messrs. Road Transport Company against respective motor transport receipts. The 24 bills of the said consignments, Motor Transport Receipts along with demand drafts were presented to the defendant Bank duly endorsed in favour of the defendant Bank.

3. The plaintiff company brought the suit against the defendant Bank (hereinafter referred to as the Bank) for a claim of Rs. 81,075/50 towards cost of Bills and Hundies and interest on the ground inter alia that the Bank in usual course of its business purchased bills for collection and credited the amount of such bills in the account of its customers and received Hundi-bilty (Transport Receipts) duly endorsed in its favour for presentation to the concerned party to secure its collection. The plaintiff company was one of its such customers who besides other accounts had a "Bill purchase account" with the Bank. The plaintiff averred that a respresentative of Bombay Textile Agency, Semapur, District Purnia, Bihar had purchased 43 bales of cloth from the plaintiff worth

Rs. 77,975-50 p. and instructed to send the relevant documents for collection of price through any Bank. Accordingly, the plaintiff company consigned the said goods on various dates in Jan. and Feb. 1972 as detailed in plaint para No. 4, through the carriers Messrs. Road Transport Company for delivery against motor transport receipts along with the demand drafts (Hundies) covering the price of the goods consigned duly endorsed in favour of the defendant Bank on various dates when the consignments were despatched in Jan. and Feb. 1972.

4. It has been further averred by the plaintiff company that as usual and as per practice of bill purchase facility, the defendant Bank purchased the said bills of the plaintiff company, worth Rs. 77,975-50 and accepted the aforesaid all the Hundies for the like amount drawn on Bombay Textiles Agency, Semapur, along with respective transport receipts duly endorsed in favour of the Bank and credited Rs. 77,975-50 to the account of the plaintiff company and took upon itself the responsibility of securing the said amount from the party concerned through any scheduled Bank and to reimburse to itself the price of the said bills purchased from the plaintiff company.

5. The plaintiff company pleaded that to its surprise the defendant Bank by its letter dated 5th May 1972 (Ex. P-2) informed the plaintiff company that as the bills were long outstanding in their books against the plaintiff, and therefore the Bank was reversing the credit entry and debiting the amount of the said bills. The plaintiff company by its letter dated 10th May 1972 (Ex. P-5) protested against it by contending that if the Bank had by its negligence or otherwise wrongly delivered the documents by reason of which the goods have been lost, the plaintiff is entitled for payment of the amounts covered by the bills purchased by the Bank and the Bank had no right to debit the price unless the relevant documents purchased by the Bank or the goods covered by them are returned back to the plaintiff company. In spite of this protest, the defendant Bank neither returned the relevant documents nor struck off the debit entry and hence the plaintiff brought this suit for recovery of the said amount with interest.

6. The defendant Bank contested the suit by contending that the Bank does not purchase any bills or documents and no purchase as such is involved in any of the transactions. The Bank pleaded the usual practice followed by it in the ordinary course of its business in the matter of collection of bills accompanied with relevant documents like this. The Bank acts only as a collecting agent merely earning a commission and receive the usual handling charges. The documents are endorsed in favour of the Bank with a view to facilitate collection and also by way of security for the credit facility provided by crediting the amount to the customer's account in anticipation of collection. If the drawer gives specific instructions for collection of bills through a particular agency, the Bank proceeds to do so. But where no such instructions are given the Bank collects the bills through one of its own branches or any other Bank of its choice. When the bills and documents are received and accepted by the Bank for collection, the Bank's customers are required to fill and sign a printed application form (Annexure 'A' and marked as Ex. P-9) in which the blank space is provided for noting the agency through which the bills are to be routed. But the blank space in the form being very short, is generally left vacant by the customers and the instructions for routing the documents through a particular agency are noted on the bill, and invoices which are treated sufficient and as part and parcel of the application form. If the amount is collected the same is credited in the 'Bills Purchased Account' of the customer. But if the amount is not collected, the credit entry initially made in favour of the customer is reversed by debiting the same amount with interest in the current account of such a customer and such reverse entries are also made in case of undue delay in collection.

7. The defendant Bank while admitting the receipt of bills of the goods accompanied by relative Transport receipts and demand drafts duly endorsed in its favour as payable to the defendant Bank or its order, denied the allegations that the Bank was purchaser of the said bills from the plaintiff company and took the plea that it was only a collecting agent for the plaintiff company according to its instructions and on the conditions appearing in the application form a specimen of which is Ex. P-9. The Bank also denied that the plaintiff instructed to

send the documents through any Bank for collection of the price of 43 bales worth Rs. 77,975-50, and pleaded that the plaintiff instructed for collection of the bills through the "Canara Banking Corporation, Semapur Factory, Bihar." and accordingly, when the plaintiff handed over the 14 (24?) bills and the relevant documents to the defendant Bank with application in printed form, for the purposes of collection, the Bank was specifically instructed by the plaintiff company to send the bills and documents for presentation and collection to the Canara Banking Corporation, Semapur and the Bank Manager, Shri Chiman Lal Shah (D. W. 1) was also orally communicated the said instructions. Not only this, but the plaintiff company had also noted these instructions on the bills. The defendant Bank acting on the instructions so given, sent all the bills and documents for the 43 bales on six different dates by post under registered covers addressed to Canara Banking Corporation, Semapur, with necessary instructions for presenting the bills and delivery of documents duly endorsed after collection to the drawee named in the bills, but no intimation as to collection of bills was received by the Bank within a reasonable time, and therefore, the Bank, on 12-4-1972, wrote to the Canara Banking Corporation, Semapur, making the necessary enquiry. But this letter was received back on 26-4-1972 with the remarks that the addressee had "left". The defendant Bank later on learnt that there was no such branch of the Canara Bank at semapur and that the registered covers were in fact delivered to one "Canara Banking" Corporation, Semapur, for whom one Ratanlal Agarwal signed as Manager and thus someone played fraud in receiving the documents as also in forging endorsement on the same and obtained the delivery of the 43 bales from the Carrier for which the Bank lodged a report with the police on 30-7-1972, but no action was taken.

8. In the aforementioned circumstances, the Bank pleaded justification in reversing the credit entry and contended that the plaintiff company was not entitled to the amount of the said bills. It also took the plea that the post office through which the documents were sent per registered post was not the agent of the defendant Bank but that of the plaintiff company. It has also been averred

that it was a fraud committed by one Om Prakash and his Munim Mahadeo, and that Om Prakash, Mahadeo, Premchand and Ministry of Post and Telegraph Department were the necessary parties.

9. The learned trial court by its order dated 7-4-1975 held that no other party or persons except the defendant Bank were necessary parties to the suit. On consideration of the evidence on record, the learned trial court took the view that the defendant Bank was the purchaser of the bills in suit from the plaintiff company, worth Rs. 77,975-50, and therefore, liable for the same to the plaintiff. It also took the view that the plaintiff company was not bound to give any specific instructions for collection of the bills through any particular agency according to term No. 11 of the contract agreement Ex. P-10 and even if any instructions were given that the bills be presented for collection through Canara Banking Corporation, Semapur, the said instructions were only advisory, not binding upon the defendant Bank and that unless the documents or the goods covered by the same were delivered back to the plaintiff company, the defendant Bank was not entitled to reverse the credit entry in the plaintiff's accounts. The learned trial court therefore decreed the plaintiff's suit for Rs. 77,975-50 as cost of the said documents and Rs. 1550/- as interest with effect from 1-3-1972 to 15-7-1975 and also further interest from the date of the institution of the suit till recovery at the rate of 6% per annum, against which this appeal has been directed by the defendant-Bank.

10. The learned counsel for the appellant Bank strenuously urged that the dealings between the plaintiff company and the Bank were purely of loan facilities in terms of subsisting contract between the plaintiff company and the defendant Bank and not as sale and purchase of the title documents, and therefore, claimed absolute immunity from any liability whatsoever on the basis of the terms of the application, form Ex. P-9, and the agreement, Ex. P-10. It was contended that the Bank had simply to charge commission and interest at an agreed rate and to realise handling charges in collecting the bills for the plaintiff company and the Bank had no freedom to sell the goods covered by the Transport receipts to any person and

at a price of its own choice, and on the contrary the Bank had a right to reverse the credit entry if the documents were dishonoured and not retired by the drawee thereof, which are the factors against the concept of sale transactions as claimed by the plaintiff company. On these contentions, it was stressed that the defendant Bank was only a collecting agent for the plaintiff company and the credit given to the plaintiff after receiving the documents was by way of overdraft under the expectation that the documents will be honoured and retired by the drawee concerned. As against this, the learned counsel for the plaintiff/respondent contended that under the Banking business practice the defendant Bank was purchaser of the title documents, especially when the defendant Bank discounted the documents and gave credit of the amount of bills immediately after receiving the same and before the collection of amount from the drawee concerned.

11. Thus as seen above the main question centres round the controversy whether by accepting the relevant documents with endorsement in its favour and discounting the same by crediting the price thereof to the account of the plaintiff company immediately and before realising the same from the drawee concerned, the ownership in goods covered by the said documents passed on the defendant Bank and it became a purchaser for value of the said documents or it was simply a collecting agent for the plaintiff company on commission and other collecting charges.

12. As regards the question of transfer of ownership by transfer of title documents under the Indian Contract Act, the position has been settled by the Supreme Court in Morvi Mercantile Bank Ltd. v. Union of India, AIR 1965 SC 1954 wherein it has been held that under the Indian law the transport receipts are equated with the goods covered by them for the purposes of constituting delivery of goods within the meaning of the Contract Act and that transport receipt is a document of title to the goods covered by it and the transfer of the said document for consideration effects a constructive delivery of goods also.

13. We shall now proceed to examine the questions as posed by the respective parties as stated in paragraphs Nos. 10 and 11 above. At page 374 of the Bank-

ing Law and Practice in India, by M. L. Tannan, 16th Edn. the precautions to be taken by a banker in discounting the bills have been discussed and at page 375 under the head note, "Documentary or other bills", it has been stated that the bankers need not make thorough inquiries about the credit of the parties in case of documentary bills to which documents of title of goods, such as railway receipts etc. are attached because in case of dishonour of such bills by the drawee, or in the event of any difficulty arising in connection with the realisation of the amount from the drawer, the goods can be sold and the chances of loss to the banker are minimised. It has been further stated that it must be remembered that such bills should not be purchased from parties whom the banker does not know well as there are certain risks attached to the business.

14. It may also be noted that under the banking laws when the bills are handed over to the banker by his customer in order that the same be collected when due, and the proceeds be credited to the customer's account, then they are called, "Bills for collection". This term distinguishes from the term, "Bills negotiated" or "Bill discounted", which are bills for which the banker has given value at once, instead of waiting till the banker has actually received the proceeds of the bills when collected. Thus, in the case of the bills handed over to the banker by the customer for collection when due and to credit the amount in the account of the customer after the proceeds are actually collected, it is not a case of sale and purchase of negotiable instruments or documents of title relating to goods because these bills are merely handed over to the banker for collection and credit when received and the banker has no property in them. But the "Bills negotiated" or "Bills discounted" stand on a different footing by which the discounter is a holder for full value and gets absolute title over it. In this behalf a reference may be made to Sheldon's Practice and Law of Banking, Tenth Edition, at page 306, wherein the author has discussed that "to discount a bill" is to buy it, to become the transferee of it, by having it endorsed or transferred by delivery by the holder, giving him a price settled, either by agreement or by the current rate in the money market. It has been further stated that a discounter is a holder for

full value and not a pledgee; he can deal and part with the bills as he likes, his title to the bill and to sue on it is absolute and covers the whole face value; he is in no sense a trustee for the previous holder as to any part of the bill or its proceeds and that the person who gets the bill discounted is a transferor if by indorsement there with all the liabilities of a indorser if a transferor by delivery, then with the liabilities attaching to that character. In either case, he parts with all rights, title and interests in the bill and its proceeds.

15. Here a reference to S. 50 of the Negotiable Instruments Act, 1881, may be made with advantage which runs as under :—

"Section 50. Effect of indorsement. The indorsement of a negotiable instrument followed by delivery transfers to the indorsee the property therein with the right of further negotiation; but the indorsement may, by express words, restrict or exclude such right, or may merely constitute the indorsee an agent to indorse the instrument or to receive its contents for the indorser or for some other specified person."

A reading of the substantive part of S. 50 will go to show that the possession of the title instruments is a prima facie evidence that the holder of the same is the owner thereof and entitled to all the rights thereon and that the indorsement of a negotiable instrument followed by delivery of it, transfers to the indorsee the property therein. In the Halsbury's Laws of England in paragraph 421 at page 226 (Vol. 2, Third Edition), the discounting of Bills has been discussed under the head note "Bills taken as transferee". It has been stated that a banker discounts a bill as opposed to taking it for collection or as security for advances, when he takes it definitely and at once as transferee for value and that it does not matter that the amount of the bill, less discount, is carried to current account as in the case of a customer that is the usual course. It has been further stated that where the transaction is really one of discounting, the banker is of course at liberty to deal with the bill as he pleases rediscounting or transferring it.

16. A somewhat similar question also came up for consideration before a Division Bench of this court in The Commissioner of Income-tax, M. P. v. M/s. Laxmichand Muchhal, Indore, 1966 MP

LJ 728, in which it was held that if a Bank, after purchasing or discounting an instrument with the amount of the instrument and allows him to draw against the amount as credited before the bill or instrument is cleared, then the would be collecting the money not for the customer but chiefly for itself. From the above discussion, it is clear that if the bills and the relevant documents presented by its drawer are accepted by a banker, with endorsement in its favour and the same are immediately discounted by the banker without waiting for its collection, by giving full credit for its entire amount of the document, so presented the banker itself becomes a purchaser and the holder thereof for full value. But at page 226 in paragraph 421 itself in the Halsbury's Laws, it has been stated that whether the bill is taken from a customer for collection or as security or discounted for him, is a question of fact. We shall, therefore, advert to the evidence in this behalf.

17. Chimanlal (D.W. 1) was the Manager of the defendant Bank at the relevant time. He deposed in para 6 of his deposition that after receiving the documents duly endorsed in favour of the Bank, the value thereof is credited to the account of the customer and if the customer so desired he may withdraw the said amount from his account. He also admitted that the amount so credited is the value of the goods covered by the bills and that after the transport receipts are presented to the Bank duly endorsed in its favour, the Bank further indorses the same in favour of the collecting agent and that party alone will get the goods in whose favour the bank endorses the same. Almost the same facts are reiterated by the Accountant of the Bank Madhusudan (D.W. 3), who went to the extent of admitting that the Bank purchases the Hundi-builty from customers and the value thereof is immediately credited to the account of the customer and if the customer so desires, he can withdraw the amount immediately. He also deposed that the amount so paid to the customers for purchase of bills, is recovered back only after returning the documents to the customer concerned. From this evidence, it is amply clear that the defendant Bank was not only a collecting agent of the documents presented to it by the plaintiff company but the documents on presentation were

discounted by the Bank and the value was credited to the account of the plaintiff immediately without waiting for its collection from the drawee. These facts and circumstances clearly make out a case that the Bank was purchaser of title documents and it was holder thereof for full value and therefore it was the responsibility of the Bank itself to collect the mount of the bills from the drawee to reimburse itself and if the drawee refused or the documents were dishonoured or the drawee could not be found, to present the documents back to the drawer and collect the value thereof either in cash or by reversing the credit entry by debiting the same amount in the plaintiff's account and not otherwise.

18. The defendant Bank claimed immunity on the basis of the terms printed in the application form, Ex. P-9, and the agreement, Ex. P-10, as well as on the basis of the instructions alleged to have been given by the plaintiff company to collect the bills through Canara Banking Corporation, Semapur. But on scrutiny of the evidence, the learned trial court found that the defendant Bank had failed to establish the same. We have also scrutinised the evidence and find that these conclusions are well founded and call for no interference. It may be seen that the application form, Ex. P-9 and the alleged agreement Ex. P-10, are only pro forma copies in which there are no signatures of either party. The originals thereof being in possession of the Bank, were not produced to prove the same. The evidence regarding the instructions alleged to have been given by the plaintiff for collection of the bills through a particular agency is neither satisfactory nor consistent. It is clear from the evidence of the defendant itself that the blank space in the application form, a copy of which is Ex. P-9, was left vacant by the plaintiff and it was not specified as to from which agency the bills had to be collected and it was thus left to the discretion of the Bank to select the agency of its own choice. The evidence of the Bank Manager, Chimanlal (D. W. 1) and Accountant Madhusudan (D. W. 3) that the instructions for collection through a particular agency were written in the Hundies given by the plaintiff could not be accepted for the simple reason that no such instructions are noted in the carbon copies of Hundies produced by the

plaintiff. In the absence of any satisfactory and convincing evidence in this behalf, it has to be assumed that the defendant Bank adopted its own mode and choice of agency in sending the documents through the post office by registered post which were delivered to some wrong and unknown person, who took the delivery of the goods and committed fraud. In these circumstances, the defendant Bank was not entitled to reverse the credit entry, and more so, without returning back the documents to the drawer.

19. In the result, the appeal fails and is hereby dismissed with costs. Counsel's fee, Rs. 600/-, if certified.

                                    Appeal dismissed.

---

**AIR 1982 MADHYA PRADESH 91**

G. P. SINGH, C. J. AND K. K. DUBE, J.

M/s. K. P. Sons, Petitioner v. The Union of India and others, Respondents.

Misc. Petn. No. 605 of 1981. D/- 30-11-1981.

Railways Act (9 of 1890), S. 28, Rules framed under the Act — General Rules Chap. II — Rules for the registration of indent, allotment and supply of wagons, R. 201 (10) — Allotment of wagons — Sudden out of turn release of wagons to the petitioner, before releasing wagons on indents registered prior to the registration of petitioner — Held, such release of wagons to petitioner was in contravention of R. 201 (10). (Constitution of India, Arts. 226, 14.)

Where prior to the registration of petitioner's indent for supply of wagons for loading lime, indents for two wagons for loading charcoal and fourteen wagons for loading timber were already registered and the charcoal, timber and lime, all fell under item No. (1) in priority 'E' of the schedule to the General Order issued by the Central Govt. as the sudden release of wagons out of turn to the petitioner would be in contravention of R. 201 (10), in the normal course wagons should have been released first for charcoal and timber before being released on indents registered by the petitioner for lime. In such a case, the petitioner could be said to be subjected to unreasonable prejudice or disadvantage in contravention of the

**EXHIBIT B**

# O.P. GAGGAR ADVOCATE, SUPREME COURT

S-1, Akarshan Bhawan, 23, Ansari Road, Darya Ganj, New Delhi - 110002
Phone : 2328 1674, Ph/Fax : 91-11-3012 1674  Mobile : 98101 85751
E-mail: opgaggar@hotmail.com

Ref. 692-93

February 15, 2007

Prashant S. Pratap,
Law Office,
Level 15, Maker Chambers III,
Nariman Point,
MUMBAI-400 021

Dear Mr. Prashant Pratap,

Ref. Delhi High Court Execution Case No. 232/2006 titled as
Geb Shipping Limited Vs. Emmsons International Ltd.

In the above execution, the respondent appearing in the court on caveat asked for time to file reply to the petition on 3.10.2006. However till the next date of hearing i.e. 10.1.2007, they failed to file the same and sought more time from the court. On our seeking a direction to the respondent to deposit the decreetal amount in the court or alternatively an order of attachment of the assets of the respondent, the counsel Mr Puri appearing for the respondent mentioned that the petitioners have got approximately US $ 400,000/- attached in United States and are therefore adequately secured. In these circumstances the Judge observed that they may bring out these facts in their reply.

Till date, the respondent have not filed their reply to the execution petition despite the fact that only 4 weeks time was granted to them. The matter will be listed again before the court on 30.3.2007.

Yours sincerely,

(O. P. Gaggar)