Eric Lindquist
FOX HORAN & CAMERINI LLP
Attorneys for Defendants
825 Third Avenue
New York, New York 10022
(212) 480-4800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
GEB SHIPPING CO., LTD.,

                             :      Index No. 06 Civ. 7649

            Plaintiff,

                             :

      -against-               :      **DECLARATION OF**
                             :      **ERIC LINDQUIST**

EMMSONS INTERNATIONAL, LTD.,  :

                             :

           Defendants.
----------------------------------------------------X

      Eric Lindquist declares pursuant to 28 U.S.C. § 1746 and under penalty of

perjury, that the following is true and correct:

          1.      I am a member of the law firm Fox Horan & Camerini LLP,

attorneys for the defendant Emmsons International, Ltd. ("Emmsons"). I submit this

declaration in support of Emmson's motion pursuant to Rules B(1) and E(4)(f) of the

Supplemental Rules for Certain Admiralty and Maritime Claims to vacate the ex-parte

order for process of maritime attachment and garnishment and pursuant to Rules 12(b)(2)

and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint of plaintiff

GEB Shipping Co., Ltd.

          2.      Attached hereto as Exhibit 1 is a true and accurate copy of the

objection by Emmsons to enforcement of the arbitral awards filed on or about March 25,

2007 in the High Court of Delhi at New Delhi in the matter of GEB Shipping Ltd. v.

Emmsons International Ltd., Execution Case No. 232 of 2006.

Dated: New York, New York
        May 10, 2007

                              Respectfully submitted,

                              FOX HORAN & CAMERINI LLP
                              Attorneys for Defendant
                              Emmsons International Ltd.

                    By:    s/ Eric Lindquist
                              Eric Lindquist/EL4305
                              825 Third Avenue
                              New York, NY 10022
                              Tel. (212) 480-4800

**EXHIBIT ONE**

## IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)

E.A. No. _____ of 2007

IN

## EXECUTION CASE NO. 233 OF 2006

**In the matter of:**

GEB Shipping Ltd.                    ...    Decree Holder

Versus

Emmsons International Ltd.            ...    Judgment Debtor

AND

**In the matter of:**

Emmsons International Ltd.            ...    Objector

Versus

GEB Shipping Ltd.                    ...    Respondent

### INDEX

| S.NO. | PARTICULARS | PAGE NO |
|-------|-------------|---------|
| 1. | Objection under section 48 of the arbitration & conciliation act, 1996 to enforceability of the arbitral awards dated 17th February 2005 and 17th January 2006 | 1-44 |
| 2. | **Annexure 'A':** Copy of Suit No. 06CV7649 of 2006 pending in District Court, New York. | 45-60 |
| 3. | **Annexure 'B':** Copy of the Draft Survey Quantity Certificate dated 8th November 2002 | 61-66 |
| 4. | **Annexure 'C':** Copy of letter dated 8th November 2002 issued by M/s. Rishi Shipping. | 67-70 |
| 5. | **Annexure 'D':** Copy of Certificate of Cargo Stevedoring dated 8th November 2002 | 71 |
| 6. | Annexure 'E': Copy of the Cargo | 72-78 |

| | | | |
|---|---|---|---|
| | Stowage Plan. | | |
| 7. | **Annexure 'F'**: Copy of survey report by M/s. U.K. Marine (India) Surveyors | 79-86 |
| 8. | **Annexure 'G'**: Copy of the Statement of Facts dated 13th December 2002 | 87 - |
| 9. | **Annexure 'H'**: Copy of Claim Submission filed by the Respondent. | 88-139 |
| 10. | **Annexure 'I' (Colly)**: A copy of the Defence Submission, Skeleton Submissions and Closing Submissions filed by the Objector. | 140-223 |
| 11. | **Annexure 'J'**: Copy of the response filed by the Respondent to the Defence Submission filed by the Objector. | 224-367 |
| 12. | Vakalatnama | 368 |

**LexPro**
**Law Firm**
Advocates for the Objector
E-575-A, G.K.-2,
New Delhi-110 048

March 25, 2007

1

## IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)

E.A. No. ___ of 2007

IN

EXECUTION CASE NO. 232 OF 2006

<u>In the matter of</u>:

GEB Shipping Ltd.     ...   Decree Holder

Versus

Emmsons International Ltd. ...   Judgment Debtor

AND

<u>In the matter of</u>:

Emmsons International Ltd.    ...   Objector

Versus

GEB Shipping Ltd.      ...   Respondent

OBJECTION UNDER SECTION 48 OF THE ARBITRATION & CONCILIATION ACT, 1995 TO ENFORCIBILITY OF THE ARBITRAL AWARDS DATED 17TH FEBRUARY 2005 AND 17TH JANUARY 2006

MOST RESPECTFULLY SHOWETH:

<u>PRELIMINARY OBJECTIONS</u>:

1. The execution petition filed by the Respondent is not maintainable in as much as it has not been filed in compliance with the requirements under Section 47 of the Arbitration and Conciliation Act,

2

1996 (**"the Act"**).  In terms of Section 47 of the Act, the petition is required to be accompanied by

(a)   an original award or copy thereof duly authenticated in the manner required by law of the country in which it was made;

(b)   accompanied original agreement for Arbitration or duly certified copy thereof; and

(c)   such evidence as may be necessary to prove that the award is a foreign award.

It is submitted that the Respondent has failed to file the original agreement for Arbitration and as such have not complied with the legal requirements under Section 47 of the Act.  In view of the fact that the Application is not in accordance with Section 47 of the Act, the same is liable to be rejected with costs.

2.   That the Respondent is seeking to execute the aforesaid Awards in two jurisdictions.  It may be relevant to mention that the Respondent has already filed a suit for Enforcement of the aforesaid Awards before the District Court, New York in Suit No. 06CV7649 of 2006 in terms of

which the Respondent have already obtained an attachment Order for an amount equivalent to the Award amount being USD 3,65,427.17 from a dollar payment payable by a buyer of the respondent which was passing through the US Banks. Respondent has therefore, even before the Award is declared to be enforceable by this Hon'ble Court, has illegally and wrongfully obtained an attachment order as a result of which the Award amount is attached under the Orders of the District Judge at New York. Respondent is now enforcing the same Award in this Hon'ble Court thereby abusing the process of law.

It is settled and principle of law that the decree can be enforced as far as possible only in one Court and process of resorting to multiple execution proceedings should not be used to abuse the process of law to strangulate the Judgment Debtor and cease its assets in all jurisdiction in order to cause undue harm and put undue pressure on the Respondent. This Petition, is therefore liable to be rejected on this ground alone. A copy of the aforesaid suit is annexed herewith as **Annexure 'A'**.

**REPLY ON MERITS**

4

1.   The Respondent has filed a petition for execution of the arbitral awards dated 17th February 2005 and 17th January 2006. The Objector has been arrayed as the Judgment Debtor in the petition. At the very outset the Objector submits that the petition filed by the Respondent for the execution of the said awards is not maintainable inasmuch as, the said arbitral awards sought to be executed by the Respondent are not enforceable under th laws of India and thus cannot be executed as decrees of this Hon'ble Court.

**Briefly stated the facts of the case are:-**

A)   That on 30th October 2002 the Objector and the Respondent entered into a Time Charter Agreement at New Delhi (hereinafter referred to as 'the Charter Party'), pursuant to which, the Objector chartered a ship of the Respondent named as "EVANGELOS L" for carriage of wheat from Kandla Port to Yemen. The salient terms of the Charter Party were as follows:

a.  The Objector had to pay a sum of USD 6,500.00 per day as the charges for

5

chartering the vessel and which included overtime payment also.

b. The captain of the vessel was to be appointed by the owner and it was under his supervision that the cargo had to be loaded, stowed and trimmed and discharged.

c. It was the responsibility of the captain to use diligence in caring for and/or the ventilation of the cargo.

d. In case of loss of time during the charter due to detention by average accident to ship or cargo, fire, break-down, damages to hull, machinery or equipment, grounding etc. or by any other cause preventing the full working of the vessel, the payment of hire charges were to cease for the time thereby lost.

e. After completion of loading of the cargo the total quantity loaded was to be determined by a joint draft survey. On the arrival of the vessel at disport a joint survey was to be undertaken to determine

6

the quantity on arrival at disport. On completion of discharging, joint survey was to be undertaken to determine the quantity discharged. Any shortage as per draft survey was to be reimbursed by the Respondent to the Objector and if the vessel were to be detained for reasons of shortage, the time lost was to be at the Respondent's account and the vessel was to be treated as off-hire.

f. In case of any dispute between the Objector and the Respondent, the same was to be referred to the arbitration of three persons at London. One to be appointed by each of the parties and the third by the two so chosen. It was, however, agreed that before enforcement of any award, the award was to be made a rule of the Court.

B)   The vessel dropped anchor at Kandla port, Gujarat on 1st November 2002 at 23:59 hours and tendered N.O.R. at the same time. After the formalities of free pratique, hatch inspection, initial draft survey etc. were completed, the loading of the vessel

commenced on 3rd November 2002 at 18:30 hours and was completed on 7th November 2002 at 23:30 hours. However, the hose testing was not carried out on the hatch covers. Some rain was experienced on 6th November 2002 at 03:00 hours.

C)   As per the stowage / trimming plan issued by the Master, 24317.144 MTs of wheat was loaded in the vessel. This was further recorded in the Draught Survey Quantity Certificate dated 8th November 2002, the letter dated 8th November 2002 issued by M/s. Rishi Shipping and also the Certificate of Cargo Stevedoring dated 8th November 2002. Further, 6000 empty bags had to be loaded into the vessel for the purpose of vessel's stability since hold no. 4 was slack. The details of the loading are as under:

| Cargo Hold No. | Height of cargo inside hold (mtrs) | Grain capacity (as per capacity plan) (Cubic Mts.) | Approx. wheat in each hold (MT) | Approx. free space below hatch cover (cms) |
|---|---|---|---|---|
| 1 | 18.00 | 5915.7 | 5330.000 | 20 |
| 2 | 16.88 | 7860.7 | 7375.000 | 10 |
| 3 | ..... | 7640.3 | 0.000 | .... |

8

| 4 | 14,26 | 7864.2 | 5842.144 | 75 |
|---|---|---|---|---|
| 5 | 17.34 | 6126.9 | 5770.000 | 15 |
| | | 35407.8 | 24317.144 | |

Thus, as would be evident from the above, the loading of the cargo was under the directions of the Master/captain of the vessel and within the permissible capacity of the vessel. The Master had, for this purpose, given a Cargo Stowage Plan. In other words, the cargo was not loaded to the capacity that the Respondent had represented to the Objector, but was and only as per the plan given by the Master of the vessel. Furthermore, in terms of the Charter Party the loading was to be done as per the instructions of the Master and it was the obligation of the master to ensure that the loading was done properly. It was also the responsibility of the Master to use diligence in caring for and/or the ventilation of the cargo. A copy of the Draft Survey Quantity Certificate dated 8th November 2002, the letter dated 8th November 2002 issued by M/s. Rishi Shipping and the Certificate of Cargo Stevedoring dated 8th November 2002

9

are annexed herewith and marked as **Annexure "B"**, **"C"** and **"D"** respectively and a copy of the Cargo Stowage Plan is annexed herewith and marked as **Annexure "E"**.

D)   After the loading had been completed, the process of fumigation of the cargo was carried out by Pest Control India (PCI) applying the commonly used fumigant i.e. Aluminium phosphide. A dosage of 12 grams per tonnage of wheat was used. PCI used the surface treatment method of fumigation and to get best results, pipes upto 2.5 metres were laid and fumigant was put into them. It is pertinent to mention that the same method of fumigation was used for all the holds. Further, PCI is the expert and the market leader for fumigation in India.

E)   The fumigation process was completed on 8th November 2002. Hold no.2 was fumigated between 20:00 hrs and 21.30 hrs on 7th November 2002.

F)   On 8th November 2002 the vessel shifted to the inner anchorage and the vessel departed

on the same date at 1430 hrs. The Objector received a letter of protest from the Master of the vessel in which it had been alleged that on 8th November 2002 whilst the vessel was under way in the channel, due to an explosion in Hold no.2, the hatch cover of Hold no.2 had been damaged. It is relevant to mention that the Master alleged in the said letter (without there being any inspection by surveyors) that the explosion was attributable to either the cargo or the fumigant used. Clearly, the Master abruptly wanted to avoid his liability.

G)   An inspection was carried out by surveyors in respect of the alleged damage to the hatch cover and also to the cargo. Admittedly, no damage was noticed to have been caused to the cargo in Hold no.2, where the explosion was alleged to have taken place. It was, however, alleged that the hatch cover of Hold no.2 had been damaged.  M/s U.K. Marine (India) Surveyors, appointed by the Objector, surveyed the vessel and upon such survey they filed a report dated 9th November 2002, wherein they concluded by saying that:

"Cause of Damage:

In our opinion the damage to No.2 hatch covers took place due to following reasons:-

1.   Scanty knowledge to Master & Chief Officer regarding fumigation. Unaware of properties of fumigant. It rained on 6.11.02 and part of the cargo must have got wet inside hold as it was not closed. Aluminium phosphate has the property of causing explosion when in contact with excessive moisture.

2.   As compared to No.1 & 5 hold, No.2 hold having very little void space above cargo which gives no room for expansion of gas from tablets of aluminium phosphate. Result in explosion.

3.   Chief Officer could have diverted 40 to 50 tonnes of wheat in No.4 hold from No.2 hold which would have increased void space & slowed room for expansion of fumigant gas.

4.   Grain stability calculation presented with over writing on all papers & without signature of surveyor, thus giving doubts of omission & errors made in calculating stability calculation.

5.   Master & Chief Officer not aware of quantity of fumigant used in No.2 hold. Nor knowledge of properties of fumigant. It leads to confirm that slackness on part of ships officer to understand that result of consequences & lapses on their part.

6.   The holds were battered down & quick acting cleats were put in locking position. If Master was aware of the properties of fumigant then he would not have put cleats in place which means that if gas needed room for expansion, pontoons would have raised & got lowered on its own to release pressure of fumigant & the pontoons would not have got damaged.

7.     No protest was given by Master if at all the method of fumigation was wrong, or if excess fumigant was used.

<u>Conclusion:</u>

Keeping in view of above causes of damage we are of the opinion that vessels Master and Chief Officer, notwithstanding anything, failed to exercise due diligence to safeguard the interest of vessel & cargo, by not taking required steps to prevent accident that took place at No.2 hatch. During rain on 06.11.2002 Master should have covered cargo using plastic sheets in holds to prevent moisture in holds.

Charterers & his agent cannot be held responsible for any claim, delay or damage to vessel."

A copy of the survey report given by M/s. U.K. Marine (India) Surveyors is annexed herewith and marked as **Annexure "F"**.

H)     From 1455 hrs of 8.h November to 0230 hrs of 14th November, the vessel was off-hire due to repairs being carried out in the hatch of hold no.2. On 14th November the vessel proceeded from Kandla to Hodeidah, Yemen for discharge and the discharge was completed on 13th December 2002 at 1510 hours. On 13th December 2002 the

13

Statement of Facts was endorsed by the Master with "all Holds empty of cargo. Cargo Disch. as per B/L". A copy of the Statement of Facts dated 13th December 2002 is annexed herewith and marked as **Annexure "G"**.

I) Even though under the Charter Party Agreement a joint survey was to be carried out at the port of discharge by the parties, the Respondent, however, did not intimate the Objector of any survey being done by it and unilaterally the Respondent conducted a survey of the cargo at the port of discharge. Even as per the survey conducted by the Respondent the entire cargo as per the Bill of Lading had reached the port of discharge. Though the entire cargo had reached the port of discharge, the Respondent of their own accord and without any information to the Objector alleged that they have paid a sum of US$ 35,000.00 to the Receivers of cargo, for an alleged short delivery of 290.254 MTs of cargo. It is pertinent to mention that the Master had issued the certificate of the total cargo loaded at Kandla and the total cargo discharged at the port of

14

discharge, i.e. Hodeidah, Yemen and which was exactly the same quantity. This quantity was also reflected in the Bill of Lading. It is unimaginable that there could be any shortfall of cargo when the Master himself has certified that the quantity loaded was the quantity discharged. In any event, once it was certified by the Master that the quantity loaded in the vessel was 24317.144 MTs of wheat, any shortfall at the port of discharge, in terms of the Charter Party Agreement, was in any event to be borne solely by the Respondent.

J)   Once the vessel was discharged the Charter Party Agreement came to an end. However, the Respondent alleged certain claims against the Objector, which were disputed by the Objector. Consequently, disputes arose between the parties and the Respondent invoked the Arbitration agreement contained in the Charter Party Agreement.

K)   The Respondent filed the "Claim Submission" before the Arbitral Tribunal and made the following claim against the Objector:

i)     Alleged off hire from 1455 hrs on 8th November to 0230 hrs on 14th November, i.e. 5 days 11 hours 35 mins. @ $6,500 per day pro rata, less 3.75% equals $34,300.76.

ii)     Alleged cost of repairs to the hatch covers of hold no.2 $11,370.

iii)     Alleged refumigation charges $4,000

iv)     Owners indemnity claim for the settlement of the cargo claim for $35,000 plus estimated related expenses of $5,000

v)     Additional war risk premium to hold the vessel covered at Hodeidah, Yemen $32,500.

A copy of the Claim Submission filed by the Respondent is annexed herewith and marked as Annexure "H".

L)     The Objector filed its Defence Submission to the claim made by the Respondent. The Objector for the reasons stated in the said Defence Submission, denied each and every claim / allegation made by the Respondent. The Objector also filed Skeleton Submissions and Closing Submissions. The Respondent filed a response to the Defence Submission filed by the Objector. The objector craves leave of this Hon'ble Court to refer to and to rely upon the Defence Submission, Skeleton Submissions and Closing Submissions filed

16

by it, at the time of arguments. The contents of the Defence Submission, Skeleton Submissions and Closing Submissions filed by the Objector may kindly be read as a part and parcel of the present objections and the same are not being repeated herein for the sake of brevity. A copy of the Defence Submission, Skeleton Submissions and Closing Submissions filed by the Objector is annexed herewith and marked as **Annexure "I" collectively** and a copy of the response filed by the Respondent to the Defence Submission filed by the Objector is annexed herewith and marked as **Annexure "J"**.

M)    On 17th February 2005 the Arbitral Tribunal passed an award whereby it granted a sum of US$ 129,250.47 in favour of the Respondent, along with interest thereon @ 6% per annum compounded every 3 months from 15th January 2003 until the date of payment. The Tribunal also granted a sum of Euro 30,000.00 along with interest thereon @ 4.25% per annum compounded every 3 months from 27th March 2003 until the date of payment.

17

N) The Arbitral Tribunal passed another award on 17th January 2006 whereby it awarded costs in favour of the Respondent and against the Objector. The Arbitral Tribunal directed the Objector to pay the following amount to the Respondent:

a. A sum of Euro 35,000.00 along with interest thereon @ 4% per annum compounded every 3 months from 17th February 2005 until the date of payment and a sum of GBP 54,414.72 along with interest thereon @ 6.75% per annum compounded every 3 months from 17th February 2005 until payment, towards Respondent's recoverable costs and disbursements;

b. A sum of GBP 1,200.00 along with interest thereon @ 6.75% per annum compounded every 3 months from 17th January 2006 until payment, towards recoverable costs of the Costs Award; and

c. A sum of GBP 2360.00 along with interest thereon @ 6.75% per annum

compounded every 3 months from the date of payment by the Respondent until the date of reimbursement by the Objector.

2. The Objector submits that the Arbitral Awards cannot be executed as decrees of this Hon'ble Court as the same are not enforceable on the following, amongst other:

## G R O U N D S

A. For that the awards are bad in law and contrary to the agreement between the parties.

B. For that the awards deal with subject matters which are beyond the agreement between the parties and thus beyond the scope of the arbitration agreement.

C. For that the awards, if permitted to be enforced in India against the Objector shall enforced, would be contrary to the public policy of India.

19

D.   For that the awards are contrary to the laws of India.

E.   For that the awards are based on assumptions and presumptions, contrary to the evidence on record and also the agreement between the parties.

F.   For that the arbitral award has not yet become binding on the parties and is therefore, unenforceable, inasmuch as that in terms of Section 66 of the English Arbitration Act, 1996 the Respondent has to apply to the courts having jurisdiction over the place where the award was made, to enforce the award. It is only after leave is granted by such court, that the award would become enforceable. Since, the Respondent has obtained no such leave, the awards have not become binding and cannot be enforced in India and as such are against fundamental policy of Indian Law governing the appreciation of Evidence under the Indian Laws.

G.   For that there was no proof and none was advanced before the Arbitral Tribunal that

the hatch of Cargo Hold No.2 was damaged due to an explosion inside cargo Hold No.2 and not outside the said cargo Hold. In the absence of such evidence the Arbitral Tribunal ought not to have proceeded on the assumption that the explosion had taken place inside cargo Hold No.2.

H.   For that the Arbitral Tribunal ought not to have assumed that merely because an explosion, as alleged, took place inside cargo Hold No.2, it could have only been due to the fumigation done at the instance of the Objector. The Award is thus passed on the basis of conjectures and surmises and no tangible evidence was available with the Arbitrator to establish that explosion took place inside he cargo Hold No. 2 and that such explosion took place due to fumigations. The Award therefore suffers from lack of Appreciation of General rules of Evidence.

I.   For that it was the case of the Objector that the fumigation tablets react with water/moisture and the cargo of wheat getting wet during the loading process was

the reason why the explosion could have taken place. The surveyor appointed by the Respondent, i.e. Murray Fenton (India) and the surveyor appointed by the Objector M/s. U.K. Marine (India) Surveyors unanimously agreed that it had rained on the night of 6th November 2002 when the cargo was being loaded into Hold No.2 and that plastic sheet had been used to cover part of the hatch. The Arbitral Tribunal, though noted the reports by the surveyors of the Respondent and also of the Objector, chose to ignore it as unreliable.

J.    For that the Arbitral Tribunal ought not to have held contrary to the material and expert evidence on record including the report of the surveyors of the Respondent itself, that it was raining when hold no. 2 was being loaded and that the said hold was not fully but only partially covered by plastic sheets, which caused the cargo to get wet.

K.    For that the Arbitral Tribunal ought not to have held, contrary to the material and expert evidence on record, that the moisture/ wet cargo could not have reacted

with the fumigation pellets used by PCI and caused the explosion. Since, the cargo had become wet and there was high moisture content, as the Respondent had caused loading to be done when it was raining without properly covering the holds, the fumigation tablets would have reacted causing the explosion. Thus, the cause of the explosion was directly attributable to the acts of the Respondent.

L.    For that the Arbitral Tribunal failed to consider that identical method of fumigation was used for fumigating the cargo in all the Holds. Therefore, if the method of fumigation was wrong and /or dangerous or if excessive quantity of fumigation was used, then the explosion should have taken place in all the Holds and not in one Hold alone.

M.    For that the Arbitral Tribunal failed to consider that there was no damage to the cargo inside Hold No.2. If the explosion, as alleged, would have occurred inside Hold No.2 and of the magnitude alleged, which could cause substantial damage to the hatch cover then, it is impossible that no damage

would have been caused to the cargo inside the said Hold. The fact that there was no damage to the cargo inside Hold No.2 clearly establishes that the explosion had not taken place inside cargo Hold No.2. This fact was completely overlooked by the Arbitral Tribunal.

N.   For that the Arbitral Tribunal failed to consider that if no explosion had taken place inside cargo Hold No.2, then no liability for any alleged damage could be attributed to the Objector and the liability for the alleged damage was to be borne by the Respondent alone.

O.   For that the Arbitral Tribunal failed to consider that it was not denied by the Respondent that there was no excessive fumigation. If there was no excessive fumigation and the fumigation was within permissive limits, the explosion cannot be attributed to be because of any act on the part of the Objector.

P.   For that merely because an explosion took place does not and cannot ipso facto imply

that the Objector is responsible for the same. The Arbitral Tribunal proceeded in a totally illegal, prejudiced and pre-determined manner that since there was an explosion, it must have been due to some act on the part of the Objector.

Q. For that the Arbitral Tribunal totally ignored the settled principles of law that, the onus to prove that the explosion took place due to any act on the part of Objector was on the Respondent, who had alleged the same. The Respondent did not place any material or evidence that the explosion was attributable to any act on the part of the Objector, however the Arbitral Tribunal, despite this fundamental failure on the part of the Respondent, proceeded on the premise that it was for the Objector to prove that the explosion did not take place due to any act on its part. The arbitral awards are totally illegal.

R. For that the Arbitral Tribunal ignored the fact that neither bulk wheat nor the fumigation pellets used by PCI are dangerous cargo. In fact the Arbitral

Tribunal ignored its own observation that "bulk wheat is not a dangerous cargo... fumigation of bulk wheat is a normal and accepted practice; fumigation in the ordinary course does not make bulk wheat a dangerous cargo The Tribunal, therefore, finds that there was nothing inherently dangerous in the particular cargo". It is submitted that having come to the conclusion that no dangerous cargo was being carried in the Hold the Arbitral Tribunal ought not to have fastened any liability on the Objector as the ship was at all times under the control of the Master. Thus, the liability of any loss due to the alleged explosion was attributable only to the acts on the part of the Respondent. However, the Arbitral Tribunal erroneously ignored its own findings and passed the impugned awards against the Objector.

S.    For that Arbitral Tribunal came to the conclusion that, on the basis of the evidence before it, it was impossible for it to make any precise finding as to the cause of explosion. Despite this finding, it fastened the liability of the explosion on the Objector. It is

26

submitted that having come to the conclusion that the cause of the explosion could not be ascertained, the Arbitral Tribunal ought not to have on the basis of conjectures and surmises fastened the liability on the Objector, merely because an explosion had occurred and the reason for which could not be ascertained. The Arbitral Tribunal has come to conclusions, which are contrary to its own findings. The arbitral awards are ambiguous and have inconsistent and mutually destructive findings.

T.    For that the arbitral award is contrary to the law of the country in which it was made inasmuch as that the Arbitral Tribunal did not deal with and give any finding on the issue raised by the Objector that the explosion could have occurred due to improper stowing and trimming plan prepared by the Master of the vessel and the lack of ullage space in hold no. 2.

U.    For that the findings of the Arbitral Tribunal are inconsistent and contradictory inasmuch as that on the one hand the Arbitral

Tribunal came to the conclusion that fumigation itself was not dangerous cargo and that there was no excessive fumigation, on the other hand it came to the conclusion that the cause of the explosion was fumigation.

V. For that the Arbitral Tribunal failed to consider that in terms of clause 12 of the Charter Party Agreement, it was the responsibility of the Master to use diligence in caring for and/or the ventilation of the cargo. In the present case, the Arbitral Tribunal came to the conclusion, albeit wrongly, that the explosion took place due to build up of gas in hold no.2. Indisputably build up of gas could only happen due to improper ventilation. Had the Master ensured proper stowage plan, there would not have been any alleged build up of gas or pressure in hold no.2. Since, the build up of gas in hold no. 2 was directly attributable to breach of duty by the Master, the explosion which occurred due to such build up of gas and the consequential damages could have been attributed to Respondent alone. However, strangely and in a patently wrong

manner, completely disregarding clause 12 of the Charter Party Agreement, the Arbitral Tribunal fastened the liability of build up of gas on the Objector. Since the awards are patently illegal, the same ought not to be enforced. Enforcement of patently illegal awards would be contrary to the public policy of India.

W.   For that the Arbitral Tribunal completely ignored the fact that the loading, stowing and trimming of cargo was carried out as per the plan made by the Master and under his command and supervision. If the loading, stowing and trimming of cargo was imperfect, which caused the gas to be built up in the hold, then it was only because of negligence / breach of duty on the part of the Master, an employee of the Respondent. The Objector had no control or command in the process of loading, stowing or trimming of the cargo.

X.   For that the Arbitral Tribunal completely ignored the fact that the fumigation of cargo was done in the presence and under the supervision of the Master. No objection was

lodged by the Master about the manner, quality and quantity of fumigation. Thus, the same was accepted by him to be correct.

Y.  For that the Arbitral Tribunal failed to consider that even assuming, whilst denying, that there was some reaction in the fumigation pellets, which caused the gas to build up, even then, that by itself was not the cause of explosion. The explosion took place only because there was improper ventilation in the hold and there was not enough ullage between the cargo and the hatch of hold no.2. The Objector was not responsible for ventilation or stowing of cargo. This responsibility was solely of the Master of the vessel. Therefore, clearly, the explosion took place on account of breach of duty on the part of the Master of the vessel and it is Respondent, which is liable for the same.

Z.  For that the Arbitral Tribunal failed to consider that the surveyors appointed by the Respondent itself i.e. M/s. Murray Fenton (India) Surveyors had submitted a report on 4th December 2002, wherein they had clearly

stated the dosage of fumigation used by PCI was correct. Once it stood admitted that the dosage of fumigation was correct, the Arbitral Tribunal ought not to have gone contrary to the said report. The Arbitral Tribunal has failed to consider the evidence in totality. The Arbitral Tribunal has acted in a biased manner, picking only that evidence which was against the Objector while ignoring the evidence that supported the Objector.

AA. For that the Arbitral Tribunal failed to consider that the surveyors appointed by the Respondent itself i.e. M/s. Murray Fenton (India) Surveyors had submitted a report on 4th December 2002, wherein they had clearly stated the accelerated build up of gas combined with lack of free space in hold no. 2 could be the cause of explosion. However, the Arbitral Tribunal completely overlooked and infact ignored this fact.

BB. For that the Arbitral Tribunal erroneously assumed, that since there was no other cause for the explosion, it would be the fumigant or the manner in which the

fumigant was applied. This assumption is totally wrong and contrary to the material on record before the Arbitral Tribunal. Infact, there was nothing before the Arbitral Tribunal to suggest that the explosion occurred due to the use of fumigation. It was undisputed that the fumigant was not dangerous by itself and that was commonly used for wheat cargo. There was also no evidence that the fumigant, which was applied under the supervision of the Master and without any protest by him, was incorrectly applied. However, the Arbitral Tribunal only in order to arrive at some conclusion assumed that since there was an explosion it must have been due to the fumigant. The Arbitral Tribunal has passed the award only on conjectures and surmises and the awards are not based on facts or evidence but are really based on facts conjured up by the Arbitral Tribunal in the realm of imagination.

CC.   For that the Arbitral Award is in complete disregard and infact contrary to the terms of the Charter Party Agreement inasmuch as that clause 15 of the Charter Party

32

Agreement clearly provides that in case of loss of time during the charter due to detention by average accident to ship or cargo, fire, break-down, damages to hull, machinery or equipment, grounding etc. or by any other cause preventing the full working of the vessel, the payment of hire charges were to cease for the time thereby lost. Since the explosion had occurred due to breach of duty on the part of the Master of the vessel, all costs for repair were to be borne by the Respondent alone. However, the Arbitral Tribunal has awarded, contrary to the terms of the Charter Party Agreement, damages to the Respondent for lost time, during the time that the vessel was undergoing repairs at Kandla i.e. a sum of USD 34,300.76. The Arbitral Tribunal also awarded damages to the Respondent for lost time, during the time that the vessel was undergoing repairs at Piraeus i.e. a sum of USD 34,468.75 and a sum of Euro. 30,000.00 for the cost of repairs. The awards, which are contrary to the terms of the Charter Party Agreement are patently illegal and beyond the scope of the

Arbitration Agreement and as such beyond the scope of authority of the Ld. Arbitrator.

DD. For that the Arbitral Tribunal has, wrongly and contrary to the terms of the Charter Party Agreement, awarded a sum of USD 17,500.00 in favour of the Respondent towards the alleged claim of the Receiver for short delivery of cargo.

EE. For that the Arbitral Tribunal failed to consider that in terms of clause 36 of the Charter Party Agreement, any shortage in the cargo was to be reimbursed by the Respondent to the Objector. However, the Arbitral Tribunal has, contrary to clause 36 of the Charter Party Agreement, awarded a sum of USD 17,500.00 in favour of the Respondent for alleged shortage in cargo.

FF. For that the Arbitral Tribunal has failed to consider that by the admissions of Respondent, there could not have been any shortage in cargo inasmuch as the Respondent has admitted that the quantity of cargo loaded at Kandla and the quantity of cargo unloaded at Yemen was identical.

Therefore, there could have been no shortage of cargo.

GG.    For that the alleged claim for shortage of cargo was sham and the Respondent unilaterally and without any intimation to the Objector settled the same. Therefore, it is the Respondent alone which is liable for the said alleged claim.

HH.    For that, in terms of Clause 36 of the Charter Party Agreement, on the arrival of the vessel at disport, a joint survey was to be undertaken by the parties to determine the quantity of cargo on arrival at disport. Further, on completion of discharging, joint survey was to be undertaken to determine the quantity discharged. In breach of Clause 36 of the Charter Party Agreement, the Respondent did not permit a joint survey at the time of disport or after the completion of discharge and, therefore, the Objector is not bound by or accountable for any alleged claim towards shortage in cargo.

II.    For that the Arbitral Tribunal failed to consider that there was no evidence and

none had been alleged for the alleged shortage in cargo and/or any compensation being paid by the Respondent to the Receiver. On the mere allegation of the Respondent that there was shortage in cargo and for which it had to compensate the Receiver, who it was alleged by the Respondent had made a claim which was settled by the Respondent, the Arbitral Tribunal awarded damages for the same in favour of the Respondent. The Arbitral Tribunal conducted the proceedings in a totally illegal manner and the awards, which are tainted with illegality and is non-est.

JJ.   For that the Arbitral Tribunal failed to consider that as per the stowage / trimming plan issued by the Master, 24317.144 MTs of wheat was loaded in the vessel. This was further recorded in the Draught Survey Quantity Certificate dated 8th November 2002, the letter dated 8th November 2002 issued by M/s. Rishi Shipping and also the Certificate of Cargo Stevedoring dated 8th November 2002. If there was any shortfall in the quantity of cargo, then it was to be borne solely by the Respondent.

36

KK.    For that the Arbitral Tribunal, by directing the Objector to compensate the Respondent for the payment allegedly made by it to the Receiver of cargo for the alleged shortage in the cargo, is giving premium to dishonesty inasmuch as that the Respondent had without giving any opportunity to the Objector to show as to how there was no shortage in cargo, immediately on an alleged demand being made by the Receiver of cargo settled their alleged claim.

LL.    For that The Arbitral Tribunal acted contrary to the terms of the Charter Party Agreement by granting the cost of the additional war risk insurance premium i.e. a sum of USD 32,500.00 in favour of the Respondent. It is submitted that on 18th October 2002 i.e. some 12 days before the parties entered into the Charter Party Agreement, the underwriters of the Respondent had informed the Respondent that Yemen would be an additional premium area. The Respondent was thus aware that if the port of discharge was to be Yemen, then additional war risk premium would have to

be paid by it to the underwriters. Being fully aware of this condition, the Respondent in Clause 1 of the Charter Party Agreement agreed that all insurance for the vessel which would meet with the requirement of all ports of call and canal for and during the service would be paid by it. In Clause 63 it was agreed that any extra war risk premium which was not known to the Respondent would be paid by the Objector. Since, the additional war risk premium for Yemen was known to the Respondent before entering into the Charter Party Agreement, the same was to be borne solely by the Respondent.

MM, For that the Arbitral Tribunal failed to consider that there was no proof or evidence that any additional war risk premium had actually been paid by the Respondent.

NN, For that the Arbitral Tribunal failed to consider that since the vessel could not be used for the period that it was undergoing repairs at Kandla, due to an explosion which occurred by breach of duty on the part of the Master, the Objector was not liable to pay any hire charges for the said period and the

same should have been credited to the Objector's account.

OO.  For that the Arbitral Tribunal failed to consider that hire charges for the period when the vessel had been detained at Yemen after discharge of the entire cargo, could not have been claimed from the Objector as the hire came to an end, once the cargo was discharged.

PP.  For that the Arbitral Tribunal failed to consider that the Respondent could not have claimed hire charges for the period when the vessel was allegedly detained at Yemen due to the alleged claim for shortage of cargo as there was no shortage of cargo and therefore, no liability could have accrued against the Objector.

QQ.  For that the Arbitral Tribunal failed to consider that, assuming whilst emphatically denying, that the Objector was liable to pay any additional war risk premium, even then, the Objector was not liable to pay any amount towards additional war risk premium, once the hire came to an end after

discharge of cargo. The Arbitral Tribunal completely failed to consider this fact and contrary to the terms of the Charter Party Agreement, directed the Objector to pay additional war risk premium to the Respondent.

RR.   For that even though the Charter Party Agreement did not contain any agreement between the parties for payment of interest, yet the Arbitral Tribunal has awarded interest in favour of the Respondent.

SS.   For that the Arbitral Tribunal has awarded interest on interest, which is contrary to the laws of India and the award is thus illegal and unenforceable.

TT.   For that the Arbitral Tribunal has awarded the costs of the entire proceedings in favour of the Respondent and against the Objector. It is submitted that the claims of the Respondent were contrary to the terms of the Charter Party Agreement and the award dated 17th February 2005 by which the claims of the Respondent had been allowed, is illegal and unenforceable. Since, the

award by which the claims of the Respondent have been allowed is itself illegal and unenforceable, the award for the costs of the proceedings for the non-maintainable, illegal and unenforceable claims of the Respondent, is itself illegal and unenforceable.

UU. For that the Arbitral Tribunal failed to consider that the Respondent submitted no proof of costs and expenses. The Arbitral Tribunal awarded huge, excessive and inflated costs in favour of the Respondent, without any proof thereof.

VV. For that the Arbitral Tribunal acted in a biased, prejudiced and pre-determined manner against the Objector. The Arbitral Tribunal failed to act in an impartial manner. The Arbitral Tribunal proceeded on the premise that since the explosion took place while the vessel was in hire by the Objector, it was the Objector who should be responsible for the consequence of the explosion as well as its cause, while doing so the Arbitral Tribunal not only failed to consider the terms of the Charter Party

41

Agreement, but in fact acted contrary to the terms thereof. The Arbitral Awards are patently illegal and are also contrary to the public policy of India and thus, the same are not enforceable in India.

3.    The Objector craves leave of this Hon'ble Court to add / alter / amend the grounds at any time bearing the hearing.

4.    The present objections have been filed bona fide and in the interest of justice.

## PRAYER

In view of the foregoing facts and circumstances, it is most respectfully prayed that this Hon'ble Court may be pleased to decline/refuse the enforcement of the Arbitral Awards dated 17th February 2005 and 17th January 2006 and dismiss the Execution Case No. 232 of 2006 filed by the Respondent with costs in favour of the Objector.

Objector
Emmsons International Limited

Through:

(Its Managing Director)

42

Through:

**LexPro**
Advocates for the Objector
E-575-A, G.K.-2,
New Delhi-110 048

43

## IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)

E.A. No. ___ of 2007

In

**EXECUTION CASE NO. 233 OF 2006**

In the matter of:

GEB Shipping Ltd.                    ...    Decree Holder

Versus—

Emmsons International Ltd....    Judgment Debtor


AND


In the matter of:


Emmsons International Ltd....        Objector

Versus

GEB Shipping Ltd.            ...        Respondent


**AFFIDAVIT**

I, Anil Kumar Monga, s/o Sh. Madan Lal Monga, aged 50 years r/o 20, NRI Complex, Mandakani Enclave, G.K.-4, New Delhi- 110 048 do hereby solemnly affirm and state as under:


1.    That I am the Managing Director of the Objector Company and as such am competent to depose this affidavit.

44

That the accompanying objections have been drafted by our advocates under my instructions and the contents thereof are true and correct to my knowledge derived from the records of the Company and information received by me.

DEPONENT

CATION:

l at New Delhi on ___ day of March 2007 that the s of above affidavit are true and correct and material has been concealed therefrom.

DEPONENT